J-A14003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RUTH ANNA BAGGETTA | : | |
| | : | |
| Appellant | : | No. 893 MDA 2020 |

Appeal from the Judgment of Sentence Entered January 14, 2020
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0001286-2018

BEFORE:   BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED AUGUST 09, 2022**

Appellant, Ruth Anna Baggetta, appeals from the aggregate judgment of sentence of 30 to 72 months' incarceration, followed by 7 years' probation, imposed after a jury convicted her of institutional sexual assault, 18 Pa.C.S. § 3124.2(a.2)(1), endangering the welfare of a child, 18 Pa.C.S. § 4304(a)(1), corruption of a minor, 18 Pa.C.S. § 6301(a)(1)(ii), furnishing alcohol to a minor, 18 Pa.C.S. § 6310.1(a), and failing to report or refer, 23 Pa.C.S. § 6319(a)(1). Appellant raises various issues on appeal, including challenges to the weight and sufficiency of the evidence, and the discretionary aspects of her sentence. After careful review, we affirm.

Appellant was convicted of the above-stated offenses based on evidence that she and her husband abused a minor, female victim over the course of

_____

[*] Former Justice specially assigned to the Superior Court.

several months.[1] More specifically, Appellant's husband, who was a former substitute teacher at the victim's high school, began a sexual relationship with the victim during her sophomore year in high school. The victim testified that Appellant, who was also a teacher and the band director at the school, knew about the victim's sexual relationship with Appellant's husband and, on one occasion, Appellant participated with the victim in performing oral sex on her husband. The victim testified that she regularly stayed overnight at Appellant's home, sometimes sleeping in the bed between Appellant and her husband. The relationship culminated with Appellant, her husband, and the victim getting matching wrist tattoos. Ultimately, the victim told her psychologist about the relationship, who then reported it to authorities.

Appellant and her husband were arrested and charged with various offenses. They were tried together before a jury in June of 2019. After a three-day trial, the jury convicted Appellant of the above-stated crimes, and her husband of similar offenses. Appellant was sentenced on January 14, 2020, to the aggregate term set forth *supra*. She filed a timely post-sentence motion, which was not ruled on by the court within the requisite 120 days. *See* Pa.R.Crim.P. 720(B)(3)(a). Appellant preaciped the clerk of courts to enter an order denying her post-sentence motion by operation of law pursuant to Pa.R.Crim.P. 720(B)(3)(c). Instead of the clerk of courts doing so,

---

[1] Appellant's husband was her co-defendant at trial, and his appeal from the judgment of sentence imposed after he was convicted is before this Court at docket number 892 MDA 2020.

however, the trial court entered an order on June 25, 2020, denying Appellant's post-sentence motion.

Appellant then filed a notice of appeal on June 29, 2020.[2,3] Appellant also complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed its Rule 1925(a) opinion on October 7, 2021. Herein, Appellant states the following issues for our review:

**A. Weight of the Evidence**

> i. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgment of Acquittal when presented with the following regarding the weight of the evidence: that the jury's determination that Appellant committed the crime of institutional sexual assault, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting

---

[2] Appellant incorrectly stated in her notice of appeal that she is appealing from the June 25, 2020 order denying her post-sentence motion. An appeal properly lies from the judgment of sentence. *See Commonwealth v. Shamberger*, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*). We have corrected the caption accordingly.

[3] Because the clerk of courts never entered an order denying Appellant's post-sentence motion by operation of law, and the court's order was entered outside the 120-day period, Appellant's June 29, 2020 notice of appeal could be considered untimely. However, this Court has held that a breakdown in the operations of the court occurs when the clerk of courts fails to enter an order deeming a post-sentence motion denied by operation of law as required by Rule 720(B)(3)(c). *See Commonwealth v. Patterson*, 940 A.2d 493, 498-99 (Pa. Super. 2007) (citation omitted). Accordingly, we decline to quash this appeal.

sexual activity, and both Appellant and [her] co-defendant denied said sexual activity?

ii. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgment of Acquittal when presented with the following regarding the weight of the evidence: that the jury's determination that [Appellant] engaged in a course of conduct that violated a duty of care to the victim, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that [Appellant] repeatedly encouraged [the] alleged victim to seek psychiatric help, repeatedly consulted with the alleged victim's parents regarding her mental health, took steps to check on the health and well-being of the alleged victim, and the fact that although there were thousands of contacts between [co-]defendant and the alleged victim, none were shown to have placed her in danger, or were shown to have either established a duty of care or that duty of care was violated?

iii. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgement [*sic*] of Acquittal when presented with the following regarding the weight of the evidence: whether the jury's determination that [Appellant] corrupted the morals of a minor by committing the crime of institutional sexual assault, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that there was no physical or corroborative evidence of sexual activity, [and] no digital evidence suggesting sexual activity?

iv. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgment of Acquittal when presented with the following regarding the weight of the evidence: that the jury's determination that [Appellant] furnished alcohol to a minor, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that there was no evidence of the alleged victim being under the influence of alcohol, or testimony as to the effects of the purported alcohol on the alleged victim such that one could infer her ingestion of an actual alcoholic substance?

v. Whether the trial court incorrectly denied Appellant's Motion for a New Trial/Judgment of Acquittal when

- 4 -

presented with the following regarding the weight of the evidence: that the jury's determination that [Appellant] committed the crime of failure to report, is so contrary to the evidence presented, or lack thereof, as to shock the conscience, so as to warrant a new trial, in light of the fact that there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both [Appellant] and [her] co-defendant denied said sexual activity, such that there would be nothing to report?

## B. Sufficiency of Evidence

i. Whether the adjudication of guilt for endangering the welfare of [a] child[] is based upon insufficient evidence where the Commonwealth failed to prove beyond a reasonable doubt that there existed a duty of care and support for the alleged victim and/or that the duty of care and support was violated?

ii. Whether the adjudication of guilt for furnishing alcohol to minors is based on insufficient evidence where the Commonwealth failed to establish by either direct or circumstantial evidence that … any alcohol was provided to a minor in that there was no testing of the purported alcoholic substance, there was no testimony of impact suffered as a result of substance, nor any testimony regarding the minor's prior experience or knowledge of effects?

iii. Whether the adjudication of guilt for failure to report is based upon insufficient evidence where the Commonwealth failed to prove beyond a reasonable doubt that there was anything to report, in that the Commonwealth failed to present physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Appellant and her co-defendant denied said sexual activity, such that there would be nothing to report?

## C. Denial of pre-trial Motion for Review of Psychological Records

Whether the trial court erred as a matter of law in denying Appellant's request that an in[-]camera review of [the victim's] psychological records be conducted, when there was no showing that the entirety of the requested materials

would be covered … pursuant to 42 Pa.C.S.[] § 5944 and Appellant was therefore denied full and fair cross-examination?

**D. Denial of Request for Mistrial following Pedophile Comments in Closing**

Whether the trial court erred in refusing to grant [Appellant's] request for a mistrial, following the prosecutor twice referring to the Appellant and her co-defendant as "pedophiles" during closing arguments; thereby prejudicing the jury in such a manner as it was impossible for jury people to render a fair and impartial verdict?

**E. Sentencing**

i. Whether the trial court erred in sentencing Appellant to an aggregate sentence of thirty to seventy-two (30-72) months['] total confinement, followed by seven (7) years['] probation, [which,] while in the standard range of the applicable guideline[s,] was not "necessary" to address "the nature of the circumstances of the crime" in light of "the history, character and condition of the defendant." 42 Pa.C.S. §[]9725. To the contrary, the extent of the confinement imposed was not "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community[,] and the rehabilitative needs of the defendant." [42 Pa.C.S.] §[]9721(b)?

ii. Whether the trial court erred in the imposition of sentence, in failing to give adequate weight to the mitigating factors offered in favor of [Appellant] and a mitigated range sentence, specifically the length of time [Appellant] spent in prison and on home confinement without incident, her young child, her family support, the community support evidenced both at trial and in sentencing letters, her lack of a prior record or any involvement with the criminal justice system?

Appellant's Brief at 10-14 (some unnecessary capitalization omitted).

In assessing Appellant's issues, we have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have

examined the well-reasoned opinion of the Honorable Michael J. Barrasse of the Court of Common Pleas of Lackawanna County. We conclude that Judge Barrasse's 58-page, comprehensive opinion accurately disposes of the issues presented by Appellant. Accordingly, we adopt Judge Barrasse's opinion as our own and affirm Appellant's judgment of sentence for the reasons set forth therein.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/09/2022

COMMONWEALTH OF          :     IN THE COURT OF COMMON PLEAS
PENNSYLVANIA            :     OF LACKAWANNA COUNTY
                       :
        v.             :     CRIMINAL DIVISION
                       :
RUTH A. BAGGETTA       :
                       :     18 CR 1286

## OPINION

**BARRASSE, J.**

This opinion is filed pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure and pursuant to the request of the Superior Court. The Appellant's issues for appeal are as follows:

1. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Institutional Sexual Assault when there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity?

2. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Endangering Welfare of Children, finding a "course of conduct," when the Defendant repeatedly encouraged alleged victim to seek psychiatric help, repeatedly consulted with the alleged victim's parents regarding her mental health, took steps to check on the health and well-being of the alleged victim, and the fact that although there were thousands of contacts between Defendant and the alleged victim, none were shown to have placed her in danger, or were shown to have either established a duty of care or that a duty of care was violated?

3. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Corruption of Minors, finding a violation of a sexual offense under the crimes code when there was no physical or corroborative evidence

of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied sexual activity?

4. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Furnishing Alcohol to a Minor, when there was no evidence of the alleged victim being under the influence of alcohol or testimony as to the effects of the purported alcohol on the alleged victim such that one could infer her ingestion of an actual alcoholic substance?

5. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Failure to Report, when there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity, such that there would be nothing to report?

6. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Endangering of Welfare of Children when the Commonwealth failed to present evidence establishing that there existed a duty of care and support for the alleged victim and/or that the duty of care and support was in any way violated?

7. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Furnishing Alcohol to a Minor when the Commonwealth failed to present sufficient evidence that an actual alcoholic beverage was furnished to a minor in that there was no testimony regarding victim's knowledge of or prior experience with alcoholic beverages, or testimony regarding any impact suffered as a result of ingesting the purported "alcoholic" beverage?

8. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Failure to Report, when the Commonwealth failed to present physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity, such that there would be nothing to report?

2

9. Whether the trial court erred in failing to grant Defendant's pretrial motion for examination or in camera examination of the alleged victim's psychological records when the mental health of the victim was at issue in the trial, the records could have supported elements of Defendant's defense, and when there would have been no harm to the victim, as the defense sought an in camera review, and that any perceived harm to the victim would be substantially outweighed by the harm posed to the Defendant in not disclosing said records resulting in the abrogation of the Defendant's Sixth Amendment confrontation rights under both the United States and the Pennsylvania constitutions?

10. Whether the trial court erred in refusing to grant Defendant's request for a mistrial, following the prosecutor twice referring to the Defendant as a "pedophile," during closing arguments prejudicing the jury so as to render a fair and impartial verdict?

11. Whether the trial court erred in the imposition of sentence of 2 ½ to 5 years and 2 months total confinement, while in the standard range was not "necessary" to address the "nature and circumstances of the crime" in light of the history, character and condition of the Defendant and was not "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community and rehabilitative needs of the defendant?"

12. Whether the trial court erred in the imposition of sentence, in failing to give adequate weight to the mitigating factors offered in favor of Defendant and a mitigated range sentence, specifically the length of time Defendant spent in prison and on home confinement without incident, her young child, her family support, the community support evidenced both at trial and in sentencing letters, her lack of prior record or any involvement with the criminal justice system?

13. Whether the trial court erred regarding the sentencing of the Endangering the Welfare of Children count as a third degree felony, when the Criminal Information failed to allege a "course of conduct" required for the enhanced grading, regardless of the specific question posed to the jury on the verdict slip?

14. Whether the trial court erred in denying Defendant's Motion for Bail Pending Appeal when there was already a significant amount of time in jail served, and Defendant presents no threat to the community and/or victim, has both family and community support, presents no flight risk, as evidenced by the fact that while previously on bail and on home confinement she appeared for all required court appearances and committed no bail or home confinement violations, and desires to both begin the process of rebuilding her life and actively participate in the preparation of her appeal?

## FACTUAL AND PROCEDURAL HISTORY

Appellant, Ruth A. Baggetta, music teacher, and band director at Lakeland High School in Scott Township, Pennsylvania became the focus of an investigation conducted by the Lackawanna County District Attorney's Office "Special Victim's Unit,[1]" when eighteen (18) year old Victim ▓▓ disclosed incidences of abuse to her counselor. Being a mandated reporter, the counselor referred the incidences of abuse to ChildLine.[2] Upon receipt of the ChildLine referral and report, Lakeland School District resource officer Frank Rapoch of the Scott Township Police Department contacted Detective Michelle Mancuso of the Lackawanna County District Attorney's Office, "Special Victim's Unit." Detective Mancuso extensively interviewed Victim ▓▓, who provided detailed descriptions of a manipulative and intimate sexual relationship involving the Appellant, her band teacher, and the Appellant's husband, Nicodemo Baggetta[3] beginning in 2015 through 2018.

As a result of the investigation, on March 29, 2018, through Criminal Information, the Commonwealth charged the Appellant with the following offenses: one (1) count of Institutional Sexual Assault, 18 Pa. C. S. §3124.2; one (1) count of Endangering the Welfare of Children- Parent/Guardian, 18 Pa. C.S. §4304(a)(1); one (1) count of Corruption of Minors- Defendant age 18 or above, 18 Pa C.S. §6301(a)(1)(ii); one (1) count of Failure to Report/Refer, 23 Pa. C.S. §6319(a)(1); (2)(i)(iii); and one (1) count of Furnish Liquor or Malt Beverage to a Minor, 18 Pa. C.S. §6310.1(a). On June 10, 2019, the Commonwealth amended the Criminal Information to

---

[1] The "Special Victim's Unit" investigates crimes against children, including physical and sexual abuse against children.

[2] ChildLine is a child abuse hotline that provides a means for mandated reporters to report child abuse in Pennsylvania.

[3] The Commonwealth also charged Nicodemo Baggetta with the following offenses: School-Intercourse/Sexual Contact with Student, 18 Pa. C.S. §3124.2(a.2)(1); Endangering Welfare of Children- Parent/Guardian, 18 Pa. C.S. §4304(a)(1); Corruption of Minors- Defendant age 18 or above, 18 Pa. C.S. §6301(a)(1)(ii); and Furnish Liquor or Malt Beverage to a Minor, 18 Pa. C.S. §6310.1(a). Nicodemo Baggetta is the listed Appellant in Commonwealth v. Nicodemo Baggetta, 2020 MDA 892.

4

the following offenses: School- Intercourse/Sexual Contact with Student, 18 Pa. C.S. §3124.2 (a.2)(1); Endangering the Welfare of Children- Parent/Guardian, 18 Pa. C.S. §4304(a)(1); one (1) count of Corruption of Minors- Defendant age 18 or above, 18 Pa C.S. §6301(a)(1)(ii); one (1) count of Failure to Report/Refer, 23 Pa. C.S. §6319(a)(1), (2)(i)(iii); and one (1) count of Furnish Liquor or Malt Beverage to a Minor, 18 Pa. C.S. §6310.1(a).

Subsequently, the Appellant proceeded to a three (3) day jury trial[4] on each of the above-cited offenses. (Notes to Testimony hereinafter, "N.T." June 17, 2019- June 19, 2019). During trial, the Commonwealth presented five (5) witnesses and admitted multiple exhibits, including a voluminous Pen-Link database report documenting text and call frequencies between Victim ▆▆▆ and the Appellant, and Victim ▆▆▆ and the Appellant's husband, Nicodemo Baggetta. The Pen-Link database report also included the dates and times in which the text and call frequencies occurred. At the conclusion of the Commonwealth's evidence, counsel for the Appellant made an oral motion for judgment of acquittal, which this Court denied. (N.T. June 18, 2019 p. 13-14). The Appellant testified as well as the Appellant's husband, Nicodemo Baggetta, and four (4) character witnesses testifying jointly as to both the Appellant's character and her husband, Nicodemo Baggetta's character.

Accordingly, after observing all testimonial evidence and exhibits presented, including receiving several instructions provided by this Court, the jury found the Appellant guilty on all five (5) Counts of the Criminal Information. Relative to the grading of the Endangering Welfare of Children offense, the jury found the additional fact that the Appellant engaged in a "course of conduct." Also, relative to the grading of the Corruption of Minors offense, the jury found the additional fact that the Appellant engaged in a "course of conduct." To that end, this Court

---

[4] This Court granted the Commonwealth's Motion for Joinder and joined for trial the above-captioned Appellant with her husband, Nicodemo Baggetta on November 9, 2018.

requested a pre-sentence investigation report (hereinafter "PSI") as well as an assessment by the Pennsylvania Sexual Offenders Assessment Board. In preparation for sentence, this Court thoroughly reviewed the Sentencing Guidelines, as well as the PSI, a Sentencing Memo dated September 27, 2019, the Pennsylvania Sexual Offender's Assessment Board report, including all mitigating and aggravating factors, as well as the victim impact statement, and oral statements by the Appellant's parents, including several letters authored by extended family members and friends. Additionally, this Court carefully considered the Appellant's underlying criminal conduct, the abuse of authority, manipulation, seriousness, and frequency of the Appellant's offenses, as well as the particularized facts associated with the Appellant's conduct, placing an already vulnerable student at risk. The Appellant's position as the minor victim's teacher and band instructor formed the basis whereby the Appellant obtained improper and destructive control over the victim, who needed to be protected. The Appellant occupied a sufficient position of authority to be able to deter the victim for reporting the sexual abuse. This Court succinctly stated: "you did not have the adolescent's best interest as your priority." (N.T. January 14, 2020 p. 13). Therefore, this Court sentenced in the standard range on each offense for an aggregate sentence of thirty (30) to seventy two (72) months in a state correctional. Id.

Subsequently, on January 24, 2020 the Appellant filed a Post-Sentence Motion challenging the weight and sufficiency of the evidence, evidentiary rulings, and discretionary aspects of sentencing. The Appellant requested a reduced sentence, visitation with her child, and bail pending appeal or house arrest. This Court held a hearing on the Appellant's Post-Sentence Motions on March 10, 2020. Subsequently, this Court denied the Appellant's Post- Sentence Motion on June 25, 2020, and the Appellant timely filed a Notice of Appeal to the Pennsylvania Superior Court.

6

## DISCUSSION

1. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Institutional Sexual Assault when there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity?

2. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Endangering Welfare of Children, finding a "course of conduct," when the Defendant repeatedly encouraged alleged victim to seek psychiatric help, repeatedly consulted with the alleged victim's parents regarding her mental health, took steps to check on the health and well-being of the alleged victim, and the fact that although there were thousands of contacts between Defendant and the alleged victim, none were shown to have placed her in danger, or were shown to have either established a duty of care or that a duty of care was violated?

3. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Corruption of Minors, finding a violation of a sexual offense under the crimes code when there was no physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied sexual activity?

4. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Furnishing Alcohol to a Minor, when there was no evidence of the alleged victim being under the influence of alcohol or testimony as to the effects of the purported alcohol on the alleged victim such that one could infer her ingestion of an actual alcoholic substance?

5. Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the weight of evidence and/or whether the jury's determination is so contrary to the evidence presented or the lack thereof, shocking the conscience, such as to warrant a new trial as to the offense of Failure to Report, when there was no physical or

7

corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity, such that there would be nothing to report?

The Appellant's claims one (1) – five (5) challenge the weight of the evidence and have been consolidated herein, by this Court. The weight of the evidence supports the jury's verdict as to all offenses charged, including the additional "course of conduct" factors that impact offense grading. See Commonwealth v. Sanders, 42 A.3d 325, 331 (Pa. Super. 2012)(quoting Commonwealth v. Diggs, 949 A.2d 873, 880 (Pa. 2008)("[A] trial court's denial of a post-sentence motion based on a weight of the evidence claim is the least assailable of its rulings.").

The determination of whether to grant a new trial because the verdict is against the weight of the evidence rests with the discretion of the trial court and will not be disturbed unless the trial court has abused its discretion. Commonwealth v. Pronkoskie, 445 A.2d 1203, 1206 (Pa. 1982). A claim that the evidence presented at trial was contradictory and unable to support the verdict requires the grant of a new trial only when the verdict is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Saksek, 522 A.2d 70, 72 (Pa. Super. 1987). Moreover, the weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record. Commonwealth v. Zapata, 290 A.2d 114, 117 (Pa. 1972); See also Commonwealth v. Hamilton, 546 A.2d 90, 95-96 (Pa. Super. 1988), allocator denied, 558 A.2d 531 (1989)(holding that the scope of review for a claim that a verdict is against the weight of the evidence is very narrow, especially where issues of credibility are concerned, it is not the function of the appellate court to substitute its judgments based on a cold record for that of the trial court); Commonwealth v. Champney, 832 A.2d 402, 408 (Pa. 2003)(the weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the

8

evidence and to determine the credibility of the witnesses [ . . . ] an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim); Commonwealth v. Sanders, 42 A.3d 325, 331 (Pa. Super. 2012)("A jury decision to credit certain evidence and reject other testimony is appropriate; therefore, the trial court did not abuse its discretion in concluding that its sense of justice was not shocked by the verdict.").

Applying the above standards to the instant case, the Appellant's guilty verdict does not shock one's sense of justice such that it is against the weight of the evidence. The record supports the jury's finding of guilt, including the additional "course of conduct" factor. In this case, the Commonwealth presented five (5) witnesses, including the victim. At trial, the jury heard detailed, and traumatizing testimony from Joella Leader, the victim, who revealed an inappropriate, manipulative, abusive, and intimate sexual relationship with the Appellant, her teacher and band instructor, and the Appellant's husband, Nicodemo Baggetta fueled by vulnerabilities and positions, corroborated by eleven thousand (11,000) phone contacts via text or call, and ultimately, matching tattoos.

Victim testified that during her sophomore year at Lakeland High School, in the spring of 2016, she assisted with the school's production of "Annie" as a member of the lighting crew. (Notes to Testimony, June 17, 2019 p. 28, 66). Victim recalled that the Appellant's husband, Nicodemo Baggetta also assisted with the play's production; and their relationship developed. She stated: "Throughout the Annie play I started talking to Nick more outside of school usually through Snapchat." Id. at 31, 67. At the same time, Victim described a "hectic," home life with her parents, who decided to divorce. Id. Victim testified that she communicated privately with

9

the Appellant's husband through talking and texting on his cellphone and through Facebook messenger. **Id.** at 32, 70. She indicated that the private texting increased in frequency when the Appellant's husband coaxed her into breaking-up with her boyfriend. **Id.** at 33-34, 42-43. The Appellant's husband expressed that "nobody was going to be able to treat [Victim] better than he would." **Id.** at 43.

By the play's conclusion, [Victim] testified that she had dinner with the Appellant and the Appellant's husband, and while only sixteen (16) years old, she had been retained by the couple to photograph their engagement, among other things. **Id.** at 35-36, 74. Shortly thereafter, the Appellant and the Appellant's husband would randomly visit [Victim] at her jobs. She stated: "I do know that they did visit me at pretty much every job that I had." **Id.** at 38. On other occasions, the Appellant and the Appellant's husband would invite [Victim] to the Appellant's apartment and eventually, the couple's house. **Id.** at 38. [Victim] testified: "I mean, once I started seeing them outside of school it was probably weekly that I was there or that we went to dinner or that I saw them outside school." **Id.** at 41. Meanwhile, [Victim] recalled that the Appellant began to privately communicate with her more frequently. She noted that the Appellant privately communicated with her every day. **Id.** [Victim] testified that the Appellant's husband admitted he discussed his "feelings" towards Joella with the Appellant. In response, the Appellant recommended that her husband and Joella "act on those feelings so to kind of sweep them under the rug [. . .] kind of kiss and get over it." **Id.** at 43-44.

To that end, the Appellant's husband began a sexual relationship with [Victim]. She testified that the sexual relationship initiated with "sexual" Snapchats from the Appellant's husband, who directed her to delete the chats. **Id.** at 67; (N.T. **June 18, 2019** p. 6). Specifically, [Victim] testified that in May 2016, the Appellant's husband began kissing her, pulling

10

down her pants and touching the outside of her vagina. **Id.** at 44-45. [Victim] explained: "once, I was there Ruth had kind of said that there was not to be anything more than kissing. So when that was happening Nick was kind of like, well, why should there be boundaries on emotions or feelings [ . . . ] why don't you let me, [ . . . ] make you feel better." **Id.** at 45. Afterwards, [Victim] testified to at least ten (10) additional sexual incidences with the Appellant's husband, including performing oral sex on the Appellant's husband, receiving oral sex from the Appellant's husband, and engaging in anal sex with the Appellant's husband. **Id.** at 46-50, 78. [Victim] recalled that the Appellant's husband pressured her into having anal sex stating that "it was something that Ruth wouldn't do with him and that he had never done that with anybody and that I was his last chance [ . . . ] it was a first that he wanted to have with me; and I believed that at the time." **Id.** at 49. Additionally, [Victim] recalled that the Appellant also engaged in sexual activity wherein, the Appellant and Joella both performed oral sex on the Appellant's husband. [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [ . . . ] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." **Id.** at 50. [Victim] testified that she and the Appellant simultaneously performed oral sex on the Appellant's husband. **Id.** at 51, 83. [Victim] explained that she would regularly sleep at the Appellant's house overnight. **Id.** at 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [ . . . ] I usually would sleep in their bed with them [ . . . ] there were a few times where I slept in the middle between the two of them." **Id.** at 58. [Victim] also explained that on some occasions, the Appellant's husband groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next

11

to him and the Appellant. Id. at 58-59. Victim even discussed moving into the couple's house. Id. at 57. She recalled other occasions wherein the Appellant would be downstairs while Victim smoked marijuana with the Appellant's husband upstairs. Id. at 59. Victim also noted an occasion wherein the Appellant provided her with wine. Id.

Finally, to solidify and symbolize the intimate and sexual relationship that transpired, the couple and Victim obtained matching wrist tattoos. Id. at 54-57. She described previously researching a particular tattoo with the Appellant and the Appellant's husband and then traveling to Electric City Tattoo, whereupon they obtained a tattoo with three birds on a branch. Id. at 57.

The Commonwealth also produced evidence that Victim attended Lakeland High School through her sophomore year, during which the Appellant was employed as a music teacher and band director. (N.T. June 18, 2019 a.m. session p. 16, 18). Lakeland School District superintendent, William King, testified that the Appellant's occupation deemed her a "mandated reporter" of suspected child abuse. Id. at 18-19. Mr. King explained: "not only certified educators, [but] anyone that works with children are required, if there's any suspicion whatsoever of someone stepping over the line and doing something that is inappropriate with a child, whether that's sending inappropriate text messages, whether it's touching a child inappropriately or doing anything that's considered not appropriate or professional within their certification." Id. at 23. Additionally, Principal of Fell Charter Elementary School, Mary Jo Walsh described how easily a "mandated reporter," could make a report of suspected child abuse. She explained: "There's multiple ways to do that. You can do that on-line through ChildLine. You can make a phone call. The goal is to get to—to make the report as soon as possible." Id. at 28. Hypothetically, Ms. Walsh noted that if she were to become aware of a teacher having any type of inappropriate sexual conduct with a student, she would "absolutely"

12

report the abuse. **Id.** at 39. Similarly, Detective Michelle Mancuso testified that anyone under the age of eighteen (18) is considered a child. **Id.** at 43.

Moreover, the Commonwealth also produced extensive evidence corroborating the magnitude of communications between the Appellant and Victim ██████. Detective Mancuso testified that she obtained Victim's ██████ cellphone number, the Appellant's cellphone number, and the Appellant's husband's cellphone number. **Id.** at 46. Detective Mancuso confirmed the authenticity through the respective cellphone providers. **Id.** at 47-48, 50-53. She related that she obtained a "voluminous" amount of Joella's phone records for the five (5) month period of June 11, 2016 through November 12, 2016. **Id.** at 48. Although unable to retrieve the content of the communications, Detective Mancuso testified that she employed a software program named Pen-Link, which parsed out times, dates, and frequency of communications. **Id.** at 53-54.

Accordingly, Detective Tom Davis employed by the Lackawanna County District Attorney's Office for approximately twenty (20) years and certified in the use of Pen-Link software, testified that he utilized Victim's █████ phone records to create a "frequency hot number list." **Id.** at 106. Detective Davis explained that "frequency" connotates incoming and outgoing calls as well as text messages. **Id.** He further explained how he parsed out the "frequency" into time of day, day of week, and incoming or outgoing calls. **Id.** at 117, 119. Detective Davis testified that the frequency between the Appellant and Victim █████ for the period of June 11, 2016 through November 11, 2016 totaled 11,227 contacts either voice or text. **Id.** at 119, 121. Detective Davis noted that a contact occurred every day of the week with the most contact occurring on Thursdays and at all hours of the day or night. **Id.** at 123. He stated: "starting at midnight and working your way from one, two, three, four, 5 a.m. and so on up to 11 a.m. [ . . . ] the most [call frequency] was between 10:00 a.m. and 1 p.m. and then starting again at 9 p.m. to 11." **Id.**

13

at 124.

Lastly, the Appellant testified that she became more talkative with [Victim] upon the conclusion of the production of "Annie." (N.T. June 18, 2019 p.m. session p. 38). Initially, the Appellant communicated with [Victim] through her husband. Id. at 39, 71. As the relationship progressed, the Appellant testified that [Victim] photographed her engagement, attended the Appellant's wedding, stayed at the Appellant's house during their honeymoon, helped the Appellant move into her house, and stayed overnight at the Appellant's house on several occasions. Id. at 47-48, 54-56, 59, 62, 72-73. The Appellant admitted that she communicated with [Victim] via phone or text daily and "around the clock." Id. at 66, 68, 71. The Appellant also admitted that she communicated with other students through an "app," while she communicated with [Victim] directly and privately. She stated: "I contact them through an app that I had." Id. at 68. The Appellant did not dispute that approximately 11,000 frequency contacts occurred with [Victim]. Id. at 72. She also did not dispute that she obtained matching tattoos with her husband and [Victim]. Id. at 74. While the Appellant described her communications with [Victim] as "mentoring," the Commonwealth produced communications, topics, and behavior that demonstrated otherwise. For example, the Commonwealth presented texts wherein the Appellant advised [Victim] to punch her co-worker, stating: "Fuck her, Bitch," as well as naming a teacher colleague a "pussy," and responding "As Fuck," to the amount of alcohol the Appellant consumed. Id. at 77-79. Ultimately, while the Appellant expressed concern for [Victim] and a desire to mentor [Victim], the Appellant admitted that she did not consult a guidance counselor nor refer [Victim] to the guidance counselor. Id. at 45, 80. In fact, the Appellant admitted that she did not notify administration of her concerns for [Victim] mental health and well-being. Id. at 80.

Nevertheless, the Appellant challenges the weight of the evidence by arguing that there is

14

no physical or corroborative evidence of sexual activity regarding Count I, Intercourse/Sexual Contact with Student, **18 Pa. C.S. §3124.2 (a.2)(1)**. Upon review, this Court found the victim['s] Victim's testimony to be credible, and reliable enough for the jury to return a verdict of guilty on Count I. As within its province, the jury believed that the Appellant and Victim ▮ engaged in oral sex with her husband, simultaneously, and in the presence of each other, during a time in which while Victim ▮ was a student and the Appellant was a teacher. The jury heard Detective Mancuso and Detective Davis testify about the frequency of contact between the Appellant and Victim ▮, approximately 11,000 contacts within a five (5) month period. In fact, the Appellant testified that she did not contact students in the same way she contacted Victim ▮. The jury was well aware of the unusual circumstances and inappropriate grooming behaviors initiated towards a minor student, i.e. Victim ▮. The Appellant admitted to purchasing a camera lens as a gift, dinners, invitations to "hang out," approximately a dozen or more sleepovers, obtaining matching tattoos, visits to Victim's ▮ job, inviting Victim ▮ to her wedding, exchanging Christmas gifts with Victim ▮. The jurors listened to the Appellant tell them that she did not notify administration, nor refer Victim ▮ to the guidance counselor despite being concerned about Victim's ▮ mental health or suicidal ideations throughout a two (2) year period.

The jury was well within its province to decide how much weight to give all the evidence presented at trial. Conflicts between the testimonies of the victim and the Appellant are for the jury to resolve and not for the trial court to undertake. A new trial should not be granted because of a mere conflict in the testimony. **Commonwealth v Widmer, 744 A.2d 745, 751-52 (Pa. 2000)**. The jury weighed the evidence presented, evaluated the testimony of the victim and the witnesses, and made a determination thereupon. It was entitled to believe the victim and to find the Appellant incredible. Although the Appellant's version of events denies

15

sexual activity, the jury found ▓▓ [Victim] and her testimony credible and discredited that of the Appellant's. While the Appellant established an alternative theory that contradicted ▓▓ [Victim's] testimony, it did not require the conclusion that the Appellant and ▓▓ [Victim] did not simultaneously engage in oral sex with the Appellant's husband. Finally, the lack of corroborating physical evidence does not undermine ▓▓ [Victim's] testimony, found to be credible by the jury. Indeed, Pennsylvania courts have "long-recognized that the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses." **Commonwealth v. Charlton**, 902 A.2d 554, 562 (Pa. Super. 2006). The jury credited ▓▓ [Victim's] testimony as truthful and did not believe the Appellant's claim that the allegations against the Appellant and the Appellant's husband were fabricated. See **Commonwealth v. Small**, 741 A.2d 666, 672 (Pa. 1999)(Notably, the jury as the fact finder "is free to believe all, part or none of the evidence and to determine the credibility of [the] witnesses."). Also, medical evidence is not required if the fact finder believes the victim. **Commonwealth v. Jette**, 818 A.2d 533, 534 (Pa. Super. 2003) *citing* **Commonwealth v. Owens**, 549 A.2d 129, 133 (Pa. Super. 1994); **Commonwealth v. Castelhun**, 889 A.2d 1228, 1232 (Pa. Super. 2005).

This Court did not abuse its discretion by denying the Appellant's Post-Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding Count I.

Similarly, the Appellant challenges the weight of the evidence regarding Count II-Endangering the Welfare of Children- Parent/Guardian, 18 Pa. C.S. § 4034(a)(1), by arguing that the Appellant's actions were proactive and did not place ▓▓ [Victim] in danger or violate a duty of care as no duty of care existed. This Court is unconvinced by the Appellant's argument, which is based upon the Appellant's testimony that she directed ▓▓ [Victim] to seek counseling. This is outside

16

the purview of this Court as the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Here, the fact finder was free to believe the testimony of [Victim], who testified that the Appellant and [Victim] both performed oral sex on the Appellant's husband. [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [ . . . ] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." (N.T. June 17, 2019 p. 50). [Victim] testified that she and the Appellant simultaneously performed oral sex on the Appellant's husband. Id. at 51, 83. [Victim] explained she saw the Appellant and the Appellant's husband weekly, and that she would regularly sleep at the Appellant's house overnight. The Appellant provided her access to "hang" in the house often. The Appellant even allowed [Victim] to shower at the house. Id. at 41, 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [ . . . ] I usually would sleep in their bed with them [ . . . ] there were a few times where I slept in the middle between the two of them." Id. at 58. [Victim] also explained that on some occasions, the Appellant's husband groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and the Appellant. Id. at 58-59. [Victim] testified that the Appellant's husband purchased a vibrator for [Victim] and operated the vibrator on [Victim]. She noted that the vibrator was kept in the Appellant's upstairs bathroom drawer, easily within the purview and access of the Appellant. Id. at 60.

At the outset of the relationship, [Victim] recalled a conversation with the Appellant's husband, wherein he told [Victim] that the Appellant believed they should act on their urges and kiss. Id. at 43. [Victim] testified: "he had told me that they had kind of talked about it and that she

17.

said that at some point that we should kind of act on those feelings [ . . . ] that she had said that we should just kind of kiss and get over it." **Id.** at 44. Clearly, the Appellant's instructions were not for the purpose of safeguarding or protecting the welfare of Victim. In fact, Victim noted the Appellant's awareness of the initial sexual encounter. Victim explained that while the Appellant conducted at a music festival, Victim and the Appellant's husband engaged in sexual activity. She stated that upon the Appellant's return home, "Nick ended up telling her what had actually happened, because he said that he felt bad [ . . . ] that it wasn't supposed to go that far." **Id.** at 46. Since that initial sexual encounter, Victim testified to "more than ten" other sexual encounters with the Appellant's husband, involving oral sex, digital penetration, and anal sex **Id.** at 46-56.

Comparingly, the jurors listened to the Appellant tell them that she did not notify administration, nor refer Victim to the guidance counselor despite being concerned about Victim's mental health or suicidal ideations throughout a two (2) year period. (**N.T. June 18, 2019 p.m. session p. 45, 80).** Moreover, the jury implicitly found that the Appellant provided control and supervision of Victim assuming such a status relationship to Victim so as to impose a duty to act. The Appellant admitted that Victim stayed overnight on several occasions, describing Victim as an "adopted daughter." The Appellant stated: "when she stayed over we would be watching TV, we would play games, we would feed her dinner. Sometimes we even gave her dinner to take home so that she had some food." **Id.** at 57, 59-60. The Appellant, Victim's teacher, testified to providing Victim with a home environment, responsible for the welfare of Victim. Therefore, the Appellant held a duty to act and did more than merely disregard her husband's actions and communications towards Victim. Indeed, the Commonwealth presented evidence that the Appellant encouraged an intimate relationship, possessing awareness of the sexual activity occurring with her husband. The Appellant befriended Victim and exploited the teacher/student

18

relationship she had with Joella, especially any trust and competence [Victim's] family had bestowed upon the Appellant due to her position. She privately communicated with [Victim] frequently and inappropriately, blurring boundaries between a teacher and student by promoting bad behaviors and permitting unrestricted access to personal life and home, separate from school activities or peers. In fact, the Appellant initially contacted [Victim] through her husband. **Id.** at **39, 71.** Ultimately, the Appellant actively participated in sexual activity by simultaneously performing oral sex on her husband with [Victim] The Appellant failed to take protective action, instead she fostered opportunities for sexual activity to occur within her home and knowingly placed [Victim] in circumstances alone with her husband on several occasions, knowing that her husband would engage in sexual activity with [Victim]. **Id.** at **45, 47-50, 58-59.**

The jury's verdict and finding of a course of conduct as to Count II was clearly not against the weight of the evidence.

This Court did not abuse its discretion by denying the Appellant's Post-Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding Count II.

The Appellant's challenge to the weight of the evidence regarding Count III-Corruption of Minors -Defendant age 18 or above, **18 Pa C.S. §6301(a)(1)(ii),** also lacks merit, despite no physical corroborative evidence as the Appellant alleges. Upon review, this Court found the testimony of [Victim] to be credible and reliable enough for the jury to return a verdict of guilty and a finding of a course of conduct. [Victim] testified with significant specificity concerning the sexual encounters with the Appellant's husband occurring over two (2) years. As previously cited above, the uncorroborated testimony of [Victim], if believed by the trier of fact is sufficient to support a conviction of a sexual offense. See **Commonwealth v. Bishop,** 742 A.2d 178, 189 (Pa. Super. 1999); **Commonwealth v. Davis,** 650 A.2d 452, 455, 477 (Pa. Super.

19

1994)(uncorroborated testimony of sexual assault victim, if believed by the trier of fact, is sufficient to support convictions even if the defense presents countervailing evidence); Commonwealth v. Trimble, 615 A.2d 48, 50 (Pa. Super. 1992) (testimony of child victim alone sufficient to support conviction for sex offenses). Also, medical evidence is not required if the fact finder believes the victim. Commonwealth v. Jette, 818 A.2d 533, 534 (Pa. Super. 2003) *citing* Commonwealth v. Owens, 549 A.2d 129, 133 (Pa. Super. 1994); Commonwealth v. Castelhun, 889 A.2d 1228, 1232 (Pa. Super. 2005).

Additionally, the definition of the corruption of minors, includes, "[actions that] would offend the common sense of the community and the sense of decency, propriety and morality, which most people entertain." Commonwealth v. Leatherby, 116 A.3d 73, 82 (Pa. Super. 2015). Pennsylvania courts have determined that acts of sexual abuse fall under this definition of actions that would offend "the sense of decency, propriety and morality, which most people entertain." Id.

In the instant case, [Victim] established that the Appellant encouraged her husband to act on his urges or feelings towards [Victim]. [Victim] stated: "he had told me that they had kind of talked about it and that she said that at some point that we should kind of act on those feelings [ . . . ] that she had said that we should just kind of kiss and get over it." (N.T. June 17, 2019 p. 44). In fact, [Victim] noted the Appellant's awareness of the initial sexual encounter. [Victim] explained that while the Appellant conducted at a music festival, [Victim] and the Appellant's husband engaged in sexual activity. She stated that upon the Appellant's return home, "Nick ended up telling her what had actually happened, because he said that he felt bad [ . . . ] that it wasn't supposed to go that far." Id. at 46. Since that initial sexual encounter, [Victim] testified to "more than ten" other sexual encounters with the Appellant's husband, involving oral sex, digital

20

penetration, and anal sex. Id. at 46-56. Correspondingly, the Appellant knew that her husband separately communicated privately with [Victim] daily and "at all hours" via social media or cellphone. In fact, the Appellant initially contacted [Victim] privately through her husband, and then in addition to her husband, the Appellant developed her own means of communicating privately with [Victim]. Detectives Mancuso and Davis testified that the Appellant made contact with [Victim] every day of the week, with the most contact occurring on Thursdays and at all hours as well. (N.T. June 18, 2019 a.m. session p. 48, 117-123).

The Appellant created opportunities for [Victim] and her husband to spend periods of time together alone as well as in the Appellant's presence. [Victim] testified that the Appellant and [Victim] both performed oral sex on the Appellant's husband. [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [. . . .] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." (N.T. June 17, 2019 p. 50). [Victim] testified that she and the Appellant simultaneously performed oral sex on the Appellant's husband. Id. at 51, 83. [Victim] explained she saw the Appellant and the Appellant's husband weekly, and that she would regularly sleep at the Appellant's house overnight. The Appellant provided her access to "hang" in the house often. The Appellant even allowed [Victim] to shower at the house. Id. at 41, 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [. . . ] I usually would sleep in their bed with them [ . . . ] there were a few times where I slept in the middle between the two of them." Id. at 58. [Victim] also explained that on some occasions, the Appellant's husband groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and the Appellant. Id. at

21

58-59. [Victim] testified that the Appellant's husband purchased a vibrator for [Victim] and operated the vibrator on [Victim]. She noted that the vibrator was kept in the Appellant's upstairs bathroom drawer. **Id.** at 60. [Victim] also indicated that she would smoke marijuana upstairs with the Appellant's husband while the Appellant remained downstairs. **Id.** at 59.

The Appellant has given a parallel account of events, yet denies any criminal acts, and this does not necessitate a finding of not guilty. The jury chose to credit [Victim's] testimony and her testimony alone establishes a corruption of minors conviction. It is clear that the Appellant's actions encouraged [Victim], a sixteen (16) year old girl to engage in sexual conduct with an adult couple, the Appellant and her husband, which most people would find offensive to their common sense of decency. [Victim's] testimony revealed that the Appellant's actions and the Appellant's husband's actions, especially their daily communications conditioned [Victim] to accept the sexual conduct and be deterred from reporting the abuse. This Court does not find that any of [Victim's] testimony was contradicted in a manner that would cause this Court to find the verdict is against the weight of the evidence. Therefore, this Court did not abuse its discretion by denying the Appellant's Post-Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding Count III.

The Appellant challenges the weight of the evidence regarding Count IV- Failure to Report/Refer, **23 Pa. C.S. §6319(a)(1), (2)(i)(iii),** by claiming that no sexual activity occurred so the Appellant did not have abuse to report. However, [Victim] testified that instances of sexual activity began in May 2016 through December 2017. (N.T. June 17, 2019 p.m. p. 44, 51). She also testified that the Appellant's husband notified the Appellant immediately after their initial sexual encounter in May 2016. Since that time, [Victim] described at least ten (10) sexual encounters with the Appellant's husband, including sleeping in the same bed as the Appellant

22

and the Appellant's husband and simultaneously performing oral sex on the Appellant's husband with the Appellant. Victim's testimony reveals that the Appellant held direct knowledge of the nature of the sexual activity and willfully failed to report or make referral to the appropriate authorities. The Appellant's own testimony established that she and her husband had the means and access to Victim , and that she did not report any concerns to Victim's guidance counselor or administrators. (N.T. June 18, 2019 p.m. p. 39, 71).

The Commonwealth presented Lakeland School District Superintendent William King, who testified that the Lakeland School District employed the Appellant in September 2014 through March 2018 as a music teacher and band director. (N.T. June 18, 2019 a.m. p. 18). The Appellant's employment rendered the Appellant a "mandated reporter," required to report suspected sexual abuse. **Id.** Mary Jo Walsh, principal of Fell Charter Elementary School testified that a "mandated reporter," can make a report in "multiple ways [. . .] you can do that on-line through ChildLine. You can make a phone call. The goal is to get to – to make the report as soon as possible." **Id.** at **28**. The circumstances underlying the Appellant's conviction were related to her teaching position and a Lakeland School District student. The Appellant's teaching job involved a position of trust and a duty to report, which was compromised by her coverup of a sexual relationship between Victim , a sixteen (16) year old girl, and the Appellant's husband. The verdict shows that the jury found the Commonwealth's witnesses more compelling and that testimony, on its own, supports the conviction finding that the Appellant willfully failed to report the occurrence of a sexual relationship that occurred over an extended period of time between an adult couple and a sixteen (16) year old girl.

Therefore, this Court did not abuse its discretion by denying the Appellant's Post–Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding

23

Count IV.

The Appellant challenges the weight of the evidence regarding Count V- Furnish Liquor or Malt Beverage to a Minor, 18 Pa. C.S. §6310.1(a), by arguing that there was no evidence of ████ influence, ingestion or effects of alcohol. ████ testified that the Appellant and the Appellant's husband "usually" provided wine or liquor as well as "weed." Specifically, ████ recalled one night wherein the Appellant poured her wine. ████ stated: "I went there after an argument that I had with my father she poured me a glass of wine." (N.T. June 17, 2019 p.m. p. 59). The Commonwealth presented evidence that the Appellant engaged in communications with ████ regarding alcohol use, indicating that the Appellant was drunk "A.F." The Appellant later testified that "A.F." meant "as fuck." (N.T. June 18, 2019 p.m. p. 79). The facts elicited by the Commonwealth reveal that knowing ████ was underage, the Appellant provided wine to ████ and allowed consumption on at least one occasion. In fact, ████ utilized the term "usually," which a reasonable jury could infer that the Appellant and the Appellant's husband provided ████ with alcohol on more than one occasion. Proof of influence, ingestion or effects of alcohol on ████ are not required for a jury to convict the Appellant under 18 Pa. C.S. §6301.1(a). The jury's finding was supported by the factual record.

Therefore, this Court did not abuse its discretion by denying the Appellant's Post-Sentence Motion for an acquittal or for a new trial based on the weight of the evidence regarding Count V.

Ultimately, this Court will not substitute its judgement for the finder of fact, who is free to believe all, part, or none of the evidence, and assess the credibility of the witnesses. See **Commonwealth v. DeJesus**, 860 A.2d 102, 107-108 (Pa. 2004)(holding that questions concerning inconsistent testimony trigger the credibility of the witnesses). Clearly, the jury

24

found the testimony of the Commonwealth's witnesses, including the victim, ████ to be consistent, credible and reliable enough to return a verdict of guilty on all charged offenses.

As such, the jury's decision to credit the witnesses' respective statements does not render the verdict contrary to the evidence presented. A review of the record does not indicate that the verdict is "so contrary to the evidence as to shock one's sense of justice." Accordingly, this Court concludes that the Appellant's claims are without merit as this Court did not abuse its discretion. See **Commonwealth v. Cramer**, 195 A.3d 594, 601 (Pa. Super. 2018) (when trial court finds verdict not against weight of evidence, appellate court must give gravest consideration to trial court's conclusion because it had opportunity to hear and see evidence present).

6. **Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Endangering of Welfare of Children when the Commonwealth failed to present evidence establishing that there existed a duty of care and support for the alleged victim and/or that the duty of care and support was in any way violated?**

7. **Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Furnishing Alcohol to a Minor when the Commonwealth failed to present sufficient evidence that an actual alcoholic beverage was furnished to a minor in that there was no testimony regarding victim's knowledge of or prior experience with alcoholic beverages, or testimony regarding any impact suffered as a result of ingesting the purported "alcoholic" beverage?**

8. **Whether the trial court incorrectly denied Defendant's Motion for a New Trial/Judgement of Acquittal when presented with the following regarding the sufficiency of the evidence and/or whether the evidence was insufficient to support the jury's finding of guilt as to the offense of Failure to Report, when the Commonwealth failed to present physical or corroborative evidence of sexual activity, no digital evidence suggesting sexual activity, and both Defendant and Co-Defendant denied said sexual activity, such that there would be nothing to report ?**

The Appellant's claims six (6) – eight (8) contend that there is insufficient evidence to

25

sustain her convictions on Count II, Endangering the Welfare of Children- Parent/Guardian; Count IV, Failure to Report/Refer; and Count V, Furnish Liquor or Malt Beverage to a Minor. The standard of review in assessing whether there was sufficient evidence to sustain Appellant's convictions is well settled.

> In reviewing the sufficiency of the evidence, [the Court] must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt [ . . . ] [the Court] may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

Commonwealth v. Thomas, 988 A.2d 699, 670 (Pa. Super. 2009), *appeal denied* 4 A.3d 1054 (Pa. 2010); Commonwealth v. Woods, 638 A.3d 1013, 1015 (Pa. Super. 1994)("The entire trial record must be evaluated and all evidence received must be considered.")

Viewing all evidence in the light most favorable to the Commonwealth, the verdict winner, this Court finds that there was sufficient evidence from which the jury could conclude that the Appellant was guilty as to Count II, Count IV, and Count V. As such, this Court incorporates the aforementioned reasoning for the Appellant's weight of evidence claims in issues two, four and five in this section, respectively.

Endangering the welfare of a child, which is defined, in relevant part, as follows:

§ 4304. Endangering Welfare of Children

> (a) Offense Defined.—
> (1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa. C.S. § 4304.

26

An individual is not required to be a parent or legal guardian of a child to be found guilty of endangering the welfare of a child. Commonwealth v. Trippett, 932 A.2d 188, 195 (Pa. Super. 2007). "The language of the statute indicates that any 'other person' who supervises the child is eligible to be charged and convicted under the statute." Id. Under the supervision element of the statute, it is not the child that the appellant must have been supervising but, rather, the child's welfare, and the requirement of supervision of a child's welfare is not limited to only certain forms of supervision, such as direct or actual, but, by its plain terms, the statute encompasses all forms of supervision of a child's welfare. Commonwealth v. Lynn, 114 A.3d 796 (Pa. 2015). Pennsylvania courts have established a three-part test that must be satisfied to prove Endangering the Welfare of Children:

(1) [T]he accused [was] aware of his/her duty to protect the child;

(2) [T]he accused [was] aware that the child [was] in circumstances that could threaten the child's physical or psychological welfare; and

(3) [T]he accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

Commonwealth v. Pahel, 689 A.2d 963, 964 (Pa. Super. 1997)(quoting Commonwealth v. Cardwell, 515 A.2d 311, 315 (Pa. Super. 1986).

In Commonwealth v. Taylor, 471 A.2d 1228 (Pa. Super. 1984), the Pennsylvania Superior Court discussed the legislature's intent in enacting section 4304 and its broad statutory purpose:

> The Supreme Court has said that [s]ection 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. It is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted. Commonwealth v. Mack, 359 A.2d 770, 772 (Pa. 1976). Thus, the "common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." Id., quoting

27

<u>Commonwealth v. Marlin</u>, 305 A.2d 14, 18 (Pa. 1973).

After a review of the record, the Commonwealth presented sufficient evidence which, if believed, would support the jury's Endangering Welfare of Children verdict. Although the Appellant claims to have violated no duty of care, [Victim's] testimony as well as the Appellant herself, established that [Victim] spent innumerable meals and nights at the Appellant's house including over a dozen sleepovers, attending events together, visiting [Victim] at her job, exchanging gifts, and joining on a trip together, as well as obtaining matching tattoos. [Victim] testified while under the supervision of the Appellant, [Victim] and the Appellant's husband would engage in sexual activity, and on one occasion the Appellant participated in the sexual activity. [Victim] testified that her and the Appellant both performed oral sex on the Appellant's husband at the Appellant's design and direction in furtherance of a bribe the Appellant employed to coerce her husband into attending a family dinner. [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [. . .] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." (N.T. June 17, 2019 p. 50). [Victim] testified that she and the Appellant simultaneously performed oral sex on the Appellant's husband. <u>Id.</u> at 51, 83. [Victim] explained she saw the Appellant and the Appellant's husband weekly, and that she would regularly sleep at the Appellant's house overnight. The Appellant provided her access to "hang" in the house often. The Appellant even allowed [Victim] to shower at the house. <u>Id.</u> at 41, 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [. . .] I usually would sleep in their bed with them [. . .] there were a few times where I slept in the middle between the two of them." <u>Id.</u> at 58. [Victim] also explained that on some occasions, the

28

Appellant's husband groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and the Appellant. Id. at 58-59. **Victim** ███ recalled a conversation with the Appellant's husband, wherein he told **Victim** ███ that the Appellant believed they should act on their urges and kiss. Id. at 43. **Victim** ███ testified: "he had told me that they had kind of talked about it and that she said that at some point that we should kind of act on those feelings [ . . . ] that she had said that we should just kind of kiss and get over it." Id. at 44.

Clearly, the Appellant's instructions were not for the purpose of safeguarding or protecting the welfare of **Victim** ███. In fact, Joella noted the Appellant's awareness of the initial sexual encounter. **Victim** ███ explained that while the Appellant conducted at a music festival, **Victim** ███ and the Appellant's husband engaged in sexual activity. She stated that upon the Appellant's return home, "Nick ended up telling her what had actually happened, because he said that he felt bad [ . . . ] that it wasn't supposed to go that far." Id. at 46. Since that initial sexual encounter, **Victim** ███ testified to "more than ten" other sexual encounters with the Appellant's husband, involving oral sex, digital penetration, and anal sex. Id. at 46-56. Moreover, **Victim** ███ testified that the Appellant's husband purchased a vibrator for **Victim** ███ and operated the vibrator on **Victim** ███ She noted that the vibrator was kept in the Appellant's upstairs bathroom drawer. Id. at 60.

It is apparent that the Appellant took actions that cannot reasonably be expected to protect the welfare of **Victim** ███, specifically, as it was her responsibility to protect **Victim** ███ from her sexually abusive husband, that the Appellant facilitated conversations, living arrangements, and situations that gave her husband and herself inappropriate access to **Victim** ███, while knowing that she and her husband engaged in sexual activity with **Victim** ███, and that the Appellant did not inform law enforcement or school counselors/administrators of the misconduct. See **Commonwealth v.**

29

<u>Lynn</u>, 114 A.3d 796 (Pa. 2015); <u>Commonwealth v. Bryant</u>, 57 A.3d 191 (Pa. Super. 2012)(sufficient evidence of duty of care to the victim and that duty was violated in a sexual abuse conviction where the defendant, a 34 year old man, and the victim a 13 year old girl were frequently present in the residence together alone, the defendant was the sole adult present in the home during the sexual assaults, the victim testified that she considered the defendant a family member, and the defendant testified that he was at the victim's home 4-5 days out of the week, occasionally picked the victim up from school, and was involved in the victim's care).

In the instant case the Commonwealth proved all three elements of Endangering the Welfare of a Child beyond a reasonable doubt. The Appellant had a duty of care towards ▮▮▮ [Victim], the sixteen (16) year old student she taught and was supervising. As a student and minor, it became imperative that ▮▮▮ [Victim] obey and accept the Appellant's direction and counsel. To that end, the Appellant was entrusted with control over ▮▮▮ [Victim] in her parents' absence, responsible for ▮▮▮ [Victim] for hours at a time, even overnight. The Appellant violated that duty of care according to the testimony of both ▮▮▮ [Victim] and the Appellant, when she placed ▮▮▮ [Victim] in circumstances that endangered her physical and psychological well-being and deliberately act in a manner that did not protect ▮▮▮ [Victim's] welfare. The Appellant's arguments to the contrary are entirely unavailing. Therefore, this Court concludes that the evidence was sufficient to find Appellant guilty of Endangering the Welfare of a Child.

Next, the Appellant challenges the sufficiency of the evidence with respect to her Furnishing Alcohol to a Minor conviction. "Selling or furnishing liquor or malt or brewed beverages to minors," provides in pertinent part:

> [A] person commits a misdemeanor of the third degree if
> [s]he intentionally and knowingly furnishes...any liquor or
> malt or brewed beverages to a person who is less than 21
> years of age

30

**18 Pa. C.S. §6310.1(a).**

For purposes of Section 6310.1(a), "furnishing" means "[t]o supply, give or provide to, or allow a minor to possess on premises or property owned or controlled by the person charged." **18 Pa. C.S. § 6310.6.** The Appellant contends that there was insufficient evidence as to whether the beverage served was alcohol given the victim's lack of experience and lack of physical impact after ingesting. However, 75 Pa C.S. §6312 (a), provides, in pertinent part:

> In an action or proceeding ... in which a material element of the offense is that a substance is liquor or a malt or brewed beverage, all of the following apply:
>
>> (1) Chemical analysis is not required to prove that the substance is liquor or a malt or brewed beverage.
>> (2) Circumstantial evidence is sufficient to prove that the substance is liquor or a malt or brewed beverage.
>
> **Id.**

The evidence reveals that ~~Victim~~ recalled one night wherein the Appellant poured her wine. ~~Victim~~ stated: "I went there after an argument that I had with my father she poured me a glass of wine." (N.T. June 17, 2019 p.m. p. 59). ~~Victim~~ clearly testified that the Appellant "poured" her a glass of wine and that she knew the type of alcohol provided. **Id.** She also recalled "usually" be provided with "their wine or liquor." **Id.** ~~Victim's~~ testimony and observations, both direct and circumstantial is sufficient to support the jury's conclusion that the Appellant furnished wine to a minor. See **Commonwealth v. Oliver**, 693 A.2d 1324, 1326-1327 (Pa. Super. 1997). Importantly, proof of intoxication, ingestion, or impact of alcohol is not required to sustain a conviction under **18 Pa. C.S. § 6301.1(a)**.

Lastly, the Appellant challenges the sufficiency of the evidence with respect to her Failure to Report conviction. **23 Pa. C.S. § 6319** penalizes the failure to report suspected child abuse or make a referral to the appropriate authorities if the person or official willfully fails to do

31

so or has direct knowledge of the nature of the abuse. The statute imposes an affirmative duty to report such cases on mandated reporters and punishes the lack of action or willful failure to report in those who are mandated reporters. The Appellant asserts there was no abuse to report.

Here, Lakeland School District Superintendent William King testified that the Lakeland School District employed the Appellant as a music teacher and band instructor beginning in September 2014 through March 2018. (N.T. June 18, 2019 a.m. p. 18). Based upon the Appellant's position, Superintendent King categorized the Appellant as a "mandated reporter," required to report instances of sexual abuse, especially suspected sexual abuse of students. Id. Therefore, the Appellant held a duty of care to report the ongoing sexual activity between the Appellant's husband and ███ [Victim], a 16-year-old student. ███ [Victim] testified that the Appellant was aware of the sexual activity between her and the Appellant's husband and became actively involved in that sexual activity. ███ [Victim] testified that instances of sexual activity begin in May 2016 through December 2017. (N.T. June 17, 2019 p.m. p. 44, 51). She also testified that the Appellant's husband notified the Appellant immediately after their initial sexual encounter in May 2016. Since that time, ███ [Victim] described at least ten (10) sexual encounters with the Appellant's husband, including sleeping in the same bed as the Appellant and the Appellant's husband and simultaneously performing oral sex on the Appellant's husband with the Appellant. ███ [Victim's] testimony reveals that the Appellant held direct knowledge of the nature of the sexual activity and willfully failed to report or make referral to the appropriate authorities. The Appellant's own testimony established that she and her husband had the means and access to ███ [Victim]. The Appellant's own testimony established that she and her husband had the means and access to ███ [Victim], and that she did not report any concerns to ███ [Victim's] guidance counselor or administrators. (N.T. June 18, 2019 p.m. p. 39, 71).

32

The Commonwealth introduced additional evidence of innumerable calls/text or social media contact between the Appellant and [REDACTED] *Victim*, approximately 11,000 contacts, and between the Appellant's husband and [REDACTED] *Victim*, approximately 12,000 contacts during a five month period. (N.T. June 18, 2019 a.m. 43-54;106-124). The Appellant had sufficient information and authority to act and she failed to do so. By failing to act, the Appellant showed deliberate indifference to the welfare of [REDACTED] *Victim*. [REDACTED] *Victim's* testimony on its own is sufficient evidence of the Appellant's willful failure to report the occurrence of ongoing sexual abuse.

9. Whether the trial court erred in failing to grant Defendant's pretrial motion for examination or in camera examination of the alleged victim's psychological records when the mental health of the victim was at issue in the trial, the records could have supported elements of Defendant's defense, and when there would have been no harm to the victim, as the defense sought an in camera review, and that any perceived harm to the victim would be substantially outweighed by the harm posed to the Defendant in not disclosing said records resulting in the abrogation of the Defendant's Sixth Amendment confrontation rights under both the United States and the Pennsylvania constitutions?

~~42 Pa. C.S. § 5944 sets forth the privilege between psychiatrists and patients. It~~ states:

> No psychiatrist ... shall be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

42 Pa. C.S. § 5944.

The psychiatrist-patient privilege, modeled after the attorney-client privilege, codified a strong public policy that confidential communication made by a patient to her psychiatrist should be absolutely protected from disclosure. "Information which is protected by an absolute statutory privilege is not subject to disclosure." Commonwealth v. Eck, 605 A.2d 1248, 1252 (Pa. Super. 1992). The privilege afforded by § 5944 intends to inspire confidence in the client

33

and to encourage full disclosure to the psychiatrist, preventing the latter from making public any information which would result in humiliation, embarrassment or disgrace to the client, the privilege is designed to promote effective treatment and to insulate the client's private thoughts from public disclosure. **Commonwealth v. Kyle**, 533 A.2d 120, 128 (Pa. Super. 1987). To that end, Pennsylvania courts have unequivocally held that "the statutory privilege pursuant to Section 5944 is not outweighed by a defendant's right to cross-examine witnesses or his due process rights." **Commonwealth v. Dowling**, 883 A.2d 570, 575 (Pa. 2005); **Commonwealth v. Segarra**, 228 A.3d 943, 957 (Pa. Super. 2020)(holding that a criminal defendant accused of sexual offenses denied access to the alleged victim's records is not a constitutional violation as the records are statutorily privileged) citing, **Commonwealth v. Smith**, 606 A.2d 939, 942(Pa. Super. 1992)( [P]sychiatric records [that] are statutorily protected are not subject to discovery); **Commonwealth v. Counterman**, 719 A.2d 284, 295 (Pa. 1998)( "The statutory privilege set forth in Section 5944 is not outweighed by either a defendant's Sixth Amendment right to cross-examine a witness or his right to due process of law."); **Commonwealth v. Patosky**, 656 A.2d 499, 502-03 (Pa. Super. 1995)(citing numerous cases in which a criminal defendant's constitutional rights to confrontation and due process must yield to privilege, and holding that the trial court's refusal to allow defendant's attorney to conduct *in camera* review of sexual assault victim's psychiatric records under section 5944 did not violate his constitutional rights to confrontation, compulsory process, and due process).

As such, Victim's ███████ communications with her counselor/psychiatrist were protected by the psychiatrist-patient privilege. ███████ communications with her counselor/psychiatrist were made in confidence while she sought professional psychiatric help. This Court must preserve the confidential relationship between the victim, Victim ███ and her psychiatrist in order to promote the

34

essential purpose of the statutory privilege—to encourage and foster full disclosure during psychiatric treatment. See **Commonwealth v. Kennedy**, 604 A.2d 1036, 1046 (Pa. Super. 1992)(holding that the trial court's *in camera* review of these records constituted error); **Commonwealth v. Moore**, 584 A.2d 936, 940 (Pa. 1991)(the general powers of courts do not include the power to order disclosure of materials that the legislature has explicitly directed be kept confidential, especially statutorily protected records of a victim).

Thus, because [Victim's] ███████ mental health records are not subject to exception or discovery, and because [Victim] ███████ has not consented to the records' disclosure,[5] the Appellant's constitutional rights are not violated in protecting the records from disclosure and *in camera* review. For all of the aforementioned reasons, the Appellant's claim is without merit, [Victim's] ███████ mental health records are privileged, and cannot be disclosed to anyone, or be subject to an *in camera* review by anyone, without [Victim's] ███████ consent.

~~Notwithstanding, the record indicates that the Appellant did have a full and fair~~ opportunity to cross-examine [Victim] ███████ as to her mental health, which satisfied the Appellant's confrontation rights. Because the privilege only limits access to statements made during the course of treatment by the psychologist, it does not foreclose all lines of defense questioning, which did indeed occur in this case. Counsel for the Appellant elicited testimony from [Victim] ███████ regarding the encouragement she received from the Appellant's husband about consulting a therapist. (N.T. June 17, 2019 a.m. p. 71). Counsel for the Appellant also elicited from [Victim] ███████ that her family problems were taking a toll on her mentally, and that she suffered from depression and would engage in self- harm, specifically cutting. **Id.** at 71-72. Counsel elicited the length of time and regularity in which [Victim] ███████ consulted with the therapist, approximately two

---

[5] See **Commonwealth v. Askew**, 666 A.2d 1062 (Pa. Super. 1995)(finding no waiver where the counselor reports a victim's allegations of sexual abuse to the police).

35

(2) years, as well as the year and month in which Joella disclosed the sexual abuse to her therapist. **Id.** at 80-81. Accordingly, counsel for the Appellant effectively raised inferences helpful to the defense as to ~~Victim's~~ credibility, and potential bias, or motives. Lastly, this Court believes that ~~Victim's~~ mental condition was not at issue in this case and was irrelevant to the defense of the charges alleged. Under these circumstances, this Court properly denied an *in camera* review of the victim's privileged records.

10. **Whether the trial court erred in refusing to grant Defendant's request for a mistrial, following the prosecutor twice referring to the Defendant as a "pedophile," during closing arguments prejudicing the jury so as to render a fair and impartial verdict?**

A motion for mistrial is within the discretion of the trial court and is required only when an incident is of such a nature that its unavoidable effect is to deprive of a fair and impartial trial causing prejudice to the defendant. It is within the trial court's discretion to determine prejudice. Therefore, the standard of review is whether the trial court abused that discretion. Notwithstanding, a prosecutor is permitted considerable latitude during closing arguments. A prosecutor's arguments are deemed fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Closing arguments must be evaluated in the context, in which they were made and in light of statements made during defense counsel's summation to which the prosecutor may respond. **Commonwealth v. Ligons,** 773 A2d 1231, 1238 (Pa. 2001). In advocating their case, "prosecuting attorneys have leeway to present their arguments with logical force and vigor, and they are permitted a degree of oratorical flair." **Commonwealth v. Laird,** 119 A.3d 972, 1010-11 (Pa. 2015).

Accordingly, prosecutorial misconduct is evaluated under a harmless error standard, and does not does not take place unless the unavoidable effect of the comments at issue prejudiced the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus

36

impeding their ability to weigh the evidence objectively and render a true verdict. Commonwealth v. Caldwell, 117 A.3d 763, 774 (Pa. Super. 2015) *quoting* Commonwealth v. Judy, 978 A.2d 1015, 1020 (Pa. Super. 2009). A harmless error standard evaluates "whether a defendant received a fair trial, not a perfect trial." Judy, at 1019-1020.

Proper examination of the Commonwealth's comments in closing requires review of the arguments advanced by the defense in defense summation. As indicated, here, the defense was based essentially upon the notion that [Victim] ████ fabricated the allegations against the Appellant and the Appellant's husband. The defense actively sought to portray the victim as dishonest and sought to characterize the Commonwealth's case as based on nothing more than the unsupported allegations of a troubled child. The defense closing included argument in the following particulars: that the case centered around the uncorroborated allegation of one girl, (N.T. June, 19, 2019 p. 51-54); that [Victim] ████ recounted the allegations of abuse in an unbelievable and inconsistent manner; Id. at 51-54, 57-58; that [Victim] ████ was particularly troubled and particularly likely to lie. Id. at 60. Further, as mitigating circumstances the defense closing referenced character evidence stating that " When you talk about the woman who is the in effect superintendent of the Fell Charter School gushing with praise for Nick. You talk about the counselor at the Charter School or the secretary at the Charter School gushing with praise. They are of good character [ . . .] a cross-section of character witnesses can [ . . .] attest to the good character of these people [ . . . ] people of good character, I'm paraphrasing do not normally commit crimes. On that evidence alone, you can vote no guilty. That's the thing with character." Id. at 66. Defense counsel devoted a significant portion of closing argument to portraying the Appellant and the Appellant's husband as moral, upstanding, law-abiding teachers

37

in the community who could never commit such offenses. He argued that the teachers and administrators who taught with the Appellant and the Appellant's husband attested to these traits.

In response to defense counsel's argument, the prosecutor's remark was offered to counter character evidence by highlighting potential witness bias towards protecting the reputation of Fell Charter. In response, the prosecutor suggested, among other things, that sexual abuse occurs without witnesses and "behind closed doors," thus other teachers or administrators would be embarrassed to learn they work with a pedophile, especially a fellow educator. The consequences of Fell Charter employing a "pedophile," would be catastrophic to their employment, impacting their own livelihood. Therefore, the comments of the prosecutor represented a fair response to the defense's summation regarding character evidence. See **Commonwealth v. Judy**, 978 A.2d 1015 (Pa. Super. 2009)(holding that reference to defendant as pedophile and argument that tended to personalize these circumstances for jury did not warrant mistrial; references were made in direct response to defense contentions and represented fair means of attempting to persuade jury with a vigorous response to the defense); **Commonwealth v. Ragland**, 991 A.2d 336 (Pa. Super. 2010)(finding that the comments made by the district attorney constituted permissible oratorical flair when viewed in the context of defense counsel's contention that L.B. was a troubled child not worthy of belief, especially where the trial court promptly sustained Appellant's objection and properly instructed the jury).

Here, the prosecutor argued:

> And then you have the rest of the crew from Fell Charter testifying to Nick's good character, of course, the Baggettas are going to have good character; right? You want to talk about women who want to save — trying to get egg off their face, the three women from Fell Charter who are going to get up here and tell you, 'We never knew we had a pedophile working amongst us.' Of course they don't want that out about Fell. They don't want that to be the reputation of their school. Of course they are going to get up there and say they had no idea Nick

38

would do something like this. That he was salt of the earth. The best teacher up at Fell; right? He was such strong character [. . .] you cannot be an educator in this state if you do those things, so for them to say at the time 2016 to 2018 they had good character of course they did, they were teachers, they had to legally.

(N.T. June 19, 2019 p. 84).

Clearly, the prosecutor was arguing that the Fell Charter character evidence was unreliable and ripe with personal motivations, urging the jury to view the character evidence with disfavor. As such, this Court found the prosecutor's statement permissible rebuttal of the Appellant's mitigation evidence. It is a fair inference that Fell Charter colleagues would be concerned about the consequences of the Appellant and the Appellant's husband's actions, especially as educators and how that would impact on the reputation of Fell Charter and their own employment. Given such context, this Court declined to conclude that the remark so prejudiced the jury that it could not weigh the evidence objectively and render a true verdict. A mistrial was not warranted on this contention. See Commonwealth v. Hardcastle, 546 A.2d 1101, 1109 (Pa. 1988)(holding that [a] new trial is not mandated every time a prosecutor makes an intemperate or improper remark).

The Appellant's remaining claim also concerns the following:

And I submit to you you have heard all of the evidence. Not just Victim ████; right? Which, by the way, the judge is going to tell you if you believe ████, if you believe what she told you beyond a reasonable doubt her word alone is enough to convict the defendants. Now, we do have — you know, we went through it, there is a number of other things that corroborate ████ version of events. Of course there is not going to be a person that saw this happen other than the two defendants; right? This is happening in the safety and the confines of their own home. This is happening in the safe space that they built for ████ so, of course, there is not going to be an independent witness; right? That's not how child abuse works and that's not how pedophiles operate. They don't do it out in the middle of the street. No.

39

**Id.** at 101-102.

In this context, the prosecutor is explaining the respective burden of proof as to uncorroborated victim testimony regarding a sexual offense and the dynamics, and realistic environment in which a sexual offense likely occurs. When viewed in a larger context, the prosecutor's two references, to the term "pedophile," in fact, was the prosecutor urging the jury to consider that realistically, sexual abuse is typically secreted. The only witness being the victim, and how that bears on the credibility of the victim and others who testify to the improbability of abuse given an otherwise outwardly upstanding disposition of the alleged perpetrator. See **Commonwealth v. Ragland**, 991 A.2d 336 (Pa. Super. 2010)(finding that the comments made by the district attorney constituted permissible oratorical flair when viewed in the context of defense counsel's contention that L.B. was a troubled child not worthy of belief, especially where the trial court promptly sustained Appellant's objection and properly instructed the jury).

Moreover, any potential prejudice occurring by virtue of such term was ameliorated by this Court's instructions, which prohibited the jury to consider the term in their deliberations. This Court instructed: "Ladies and gentlemen, you've heard the term pedophile used in the closing. You are to disregard the term. There is no evidence in this case whatsoever in regard to legal or medical definition of pedophile in this case and so it's not appropriate to be considered in your jury deliberations." **Id.** at 103. The isolated and incorrect use of this term was perhaps unfortunate but it did not work to prejudice the jurors by forming in their minds a fixed bias and hostility toward the Appellant. The jury's ability to weigh the evidence objectively and render a true verdict was not impeded and most importantly this reference did not deny the Appellant the fair trial to which she is entitled. Thus, the Appellant's allegations of prosecutorial misconduct

40

Id. at 101-102.

In this context, the prosecutor is explaining the respective burden of proof as to uncorroborated victim testimony regarding a sexual offense and the dynamics, and realistic environment in which a sexual offense likely occurs. When viewed in a larger context, the prosecutor's two references, to the term "pedophile," in fact, was the prosecutor urging the jury to consider that realistically, sexual abuse is typically secreted. The only witness being the victim, and how that bears on the credibility of the victim and others who testify to the improbability of abuse given an otherwise outwardly upstanding disposition of the alleged perpetrator. See Commonwealth v. Ragland, 991 A.2d 336 (Pa. Super. 2010)(finding that the comments made by the district attorney constituted permissible oratorical flair when viewed in the context of defense counsel's contention that L.B. was a troubled child not worthy of belief, especially where the trial court promptly sustained Appellant's objection and properly instructed the jury).

Moreover, any potential prejudice occurring by virtue of such term was ameliorated by this Court's instructions, which prohibited the jury to consider the term in their deliberations. This Court instructed: "Ladies and gentlemen, you've heard the term pedophile used in the closing. You are to disregard the term. There is no evidence in this case whatsoever in regard to legal or medical definition of pedophile in this case and so it's not appropriate to be considered in your jury deliberations." Id. at 103. The isolated and incorrect use of this term was perhaps unfortunate but it did not work to prejudice the jurors by forming in their minds a fixed bias and hostility toward the Appellant. The jury's ability to weigh the evidence objectively and render a true verdict was not impeded and most importantly this reference did not deny the Appellant the fair trial to which she is entitled. Thus, the Appellant's allegations of prosecutorial misconduct

40

are without merit and this Court did not abuse its discretion in refusing to grant a mistrial on this basis. This Court properly instructed the jury and the jury is presumed to have followed such instruction. See Commonwealth v. Thompson, 660 A.2d 68, 76 (Pa. Super. 1995); See also Commonwealth v. Sanchez, 82 A.3d 943 (Pa. 2013)( It is within the sound discretion of the trial court to determine whether a curative instruction, in response to a prosecutor's improper reference during closing argument, is necessary).

11. Whether the trial court erred in the imposition of sentence of 2 ½ to 5 years and 2 months total confinement, while in the standard range was not "necessary" to address the "nature and circumstances of the crime" in light of the history, character and condition of the Defendant and was not "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community and rehabilitative needs of the defendant?"

12. Whether the trial court erred in the imposition of sentence, in failing to give adequate weight to the mitigating factors offered in favor of Defendant and a mitigated range sentence, specifically the length of time Defendant spent in prison and on home confinement without incident, her young child, her family support, the community support evidenced both at trial and in sentencing letters, her lack of prior record or any involvement with the criminal justice system?

The Appellant's claims eleven (11) and twelve (12) challenge the discretionary aspects of sentence. As observed in Commonwealth v. McLaine, 150 A.3d 70, 76 (Pa. Super. 2016), "[a]n appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right." Rather, a challenge to the discretionary aspects of a sentence, requires an appellant satisfy the following four-part test:(1) whether appellant has filed a timely notice of appeal, (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, (3) whether appellant's brief has a fatal defect, and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. Id.

41

Accordingly, the appeal is timely, and preserved in the Appellant's Post- Sentence Motion, therefore, this Court examines whether the Appellant raises a substantial question. A substantial question as to the inappropriateness of a sentence under the Sentencing Code is present "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." <u>Commonwealth v. Glass</u>, 50 A.3d 720, 727 (Pa. Super. 2012). In the present case, the Appellant cannot demonstrate that this Court acted inconsistently with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. Importantly, the sentence is a guideline sentence, and imposed within the statutory limits. See <u>Commonwealth v. Dodge</u>, 77 A.3d 1263, 1272 n. 8 (Pa. Super. 2013)( ("Careful litigants should note that arguments that the sentencing court failed to consider the factors proffered in 42 Pa.C.S. § 9721 does not present a substantial question).

On COUNT I: Intercourse/Sexual Contact with Student, 18 Pa. C.S. §3124.2 (a.2)(1), this Court sentenced the Appellant to twelve (12) – thirty- six (36) months with two (2) years special probation. A standard range sentence. The maximum term for a violation of Intercourse/Sexual Contact with Student, 18 Pa. C.S. §3124.2 (a.2)(1), graded as a felony of the third degree is seven (7) years. 18 Pa. C.S. § 1103(3). The Appellant had an offense gravity score of six (6) and a prior record score of zero (0). Under the sentencing guidelines for such scores, the standard range of minimum sentence is three (3) to twelve (12) months. The aggravated range of minimum sentence for the above scores is eighteen (18) months. This Court sentenced the Appellant to twelve (12) - thirty-six (36) months with two (2) years special probation. This Court found that the Appellant's actions were predatory since 2016, and the

42

Appellant appeared undeterred by the consequences she caused towards the victim and the community, which justified incarceration in a state correctional. (N.T. January 14, 2020 p. 13).

On Count II, Endangering the Welfare of Children- Parent/Guardian, 18 Pa. C.S. § 4034(a)(1), this Court sentenced the Appellant to twelve (12) – twenty-four (24) months with (2) years special probation. A standard range sentence. The maximum term for a violation of Endangering the Welfare of Children- Parent/Guardian, 18 Pa. C.S. § 4034(a)(1), graded as a felony of the third degree due to the jury's finding of a "course of conduct," is seven (7) years. 18 Pa. C.S. § 1103(3). The Appellant had an offense gravity score of six (6) and a prior record score of zero (0). Under the sentencing guidelines for such scores, the standard range of minimum sentence is three (3) to twelve (12) months. The aggravated range of minimum sentence for the above scores is eighteen (18) months. This Court sentenced the Appellant to twelve (12) – twenty-four (24) months with two (2) years special probation. This Court found that the Appellant abused her caretaking role/position of authority, manipulated ███ [Victim], and did not consider or prioritize ███ [Victim's] best interests. (N.T. January 14, 2020 p. 13).

On Count III, Corruption of Minors-Defendant age 18 or above, 18 Pa C.S. §6301(a)(1)(ii), this Court sentenced the Appellant to six (6) – twelve (12) months. A standard range sentence. The maximum term for a violation of Corruption of Minors-Defendant age 18 or above, 18 Pa C.S. §6301(a)(1)(ii), graded as a felony of the third degree due to the jury's finding of a "course of conduct," is seven (7) years. 18 Pa. C.S. § 1103(3). The Appellant had an offense gravity score of six (6) and a prior record score of zero (0). Under the sentencing guidelines for such scores, the standard range of minimum sentence is three (3) to twelve (12) months. The aggravated range of minimum sentence for the above scores is eighteen (18) months. This Court sentenced the Appellant to six (6) – twelve (12) months. This Court found

43

that the Appellant facilitated opportunities to develop and support sexual victimization of ██ Victim and deter ████ Victim from reporting the abuse.  (N.T. January 14, 2020 p. 13).

On Count IV, Failure to Report/Refer, 23 Pa. C.S. §6319(a)(1), (2)(i)(iii), this Court sentenced the Appellant to two (2) years special probation.  The maximum term for a violation of Failure to Report/Refer, 23 Pa. C.S. §6319(a)(1), (2)(i)(iii), graded as a felony of the third degree is seven (7) years. **18 Pa. C.S. § 1103(3).**  The Appellant had an offense gravity score of five (5) and a prior record score of zero (0).  Under the sentencing guidelines for such scores, the standard range of minimum sentence is restorative sanctions – nine (9) months.  The aggravated range of minimum sentence for the above scores is twelve (12) months.  This Court sentenced the Appellant to two (2) years special probation.

Lastly, on Count V, Furnish Liquor or Malt Beverage to a Minor, **18 Pa. C.S. §6310.1(a),** this Court sentenced the Appellant to one (1) year special probation.  The maximum term for a violation of Furnish Liquor or Malt Beverage to a Minor, 18 Pa. C.S. §6310.1(a), graded as a misdemeanor of the third degree is one (1) year.  **18 Pa. C.S. § 1104(3).**  The Appellant had an offense gravity score of one (1) and a prior record score of zero (0).  Under the sentencing guidelines for such scores, the standard range of minimum sentence is restorative sanctions.  The aggravated range of minimum sentence is Restrictive Intermediate Punishment (RIP) – three (3) months.  This Court sentenced the Appellant to one (1) year special probation.

Indeed, sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a

44

manifestly unreasonable decision. <u>Commonwealth v. Shull</u>, 148 A.3d 820, 831 (Pa. Super. 2016). There exists a deferential standard when examining any sentence since "the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review." <u>Commonwealth v. Walls</u>, 926 A.2d 957, 961 (Pa. 2007). Moreover, the sentencing court is in a superior position when deciding on an appropriate sentence because it observes the defendant and her articulation of remorse or indifference. <u>Id</u>. To that end, appellate review of a sentence is constrained by 42 Pa. C.S. § 9781(c), which provides that a sentence may be vacated and remand for re-sentence only if (1) the court intended to sentence within the guidelines but "applied the guidelines erroneously; (2) a sentence was imposed within the guidelines "but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or (3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable. In all other cases, the appellate court shall affirm the sentence imposed by the sentencing court. <u>Id</u>. "Unreasonable," connotes a decision that is 'irrational' or not guided by sound judgment. <u>Walls</u>, at 963.

A sentence not guided by sound judgment or irrational occurs in only two situations. First, it is unreasonable if the sentencing court did not weigh the "general standards applicable to sentencing found in Section 9721, *i.e.*, the protection of the public; the gravity of the offense in relation to the impact on the victim and the community; and the rehabilitative needs of the defendant. 42 Pa. C.S. § 9721(b).; <u>Walls</u>, at 964. Second, if it is unreasonable under the guidelines provided by 42 Pa. C.S. § 9781(d). In reviewing the record the appellate court shall have regard for:

> (1) The nature and circumstances of the offense and the history
> and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
(3) The findings upon which the sentence was based.
(4) The guidelines promulgated by the commission.

**Id.**

Herein the Appellant complains that the guideline range sentence is unreasonable since the underlying case involves circumstances where application of the guidelines would be unreasonable, alleging that total confinement was unnecessary. Additionally, the Appellant complains that this Court did not adequately consider mitigating factors and is asking the Pennsylvania Superior Court to re-weigh those circumstances and remand for a more lenient sentence. See Commonwealth v. Macias, 968 A.2d 773, 778 (Pa. Super. 2009)(holding that an appellate court cannot re-weigh the sentencing factors and impose judgment in the place of the sentencing court.).

There is no merit to the Appellant's claim that this Court failed to consider mitigating factors before imposing sentence. This Court heard statements in mitigation from both the mother and father of the Appellant. The trial court also considered Appellant's allocution, in which she maintained her innocence and admitted to jeopardizing her family by allowing the victim into her life. Importantly, this Court did meaningfully consider the sentencing guidelines, as well as all section 9721(b) factors, including the Appellant's individual circumstances as explained in the PSI. This Court articulated that it weighed the requisite factors when imposing its term of imprisonment and therefore sufficient reasons exist in the record to support this Court's guideline sentence. See (N.T. January 14, 2020 p. 12-13).

For example, the nature and circumstances of the Appellant's offenses support state incarceration because the Appellant repeatedly engaged in predatory behavior, and secreted her actions and the actions of her husband. It was in the context of ███ and ███ parents' trust

46

that the Appellant took advantage of the opportunity to groom and put [Victim] at risk to be sexually assaulted. The Appellant's authority and position deterred [Victim] from reporting the abuse as well as fostered [Victim's] belief that she had to obey the Appellant's advice and direction. The Appellant manipulated [Victim] into believing that the Appellant held her best interest. During trial, the Commonwealth presented this Court with several incidents for review. This Court determined that the Appellant had shown a development towards befriending [Victim] in preparation for sexual victimization over approximately two (2) years. The Appellant demonstrated a pattern of conduct dismissive of societal norms and dismissive of [Victim's] best interest as a student and a minor. The Appellant used her position in the Lakeland school community and Lakeland band community and her offer of help to [Victim] as a method to groom [Victim] to satisfy the sexual needs of her husband and herself without any regard to the damage that resulted therein. The Appellant caused severe mental anguish and emotional damage to Joella that may be irreversible. This behavior did not warrant a reduced or probationary sentence.

Although the Appellant did not have a prior record, this Court had the opportunity to view the Appellant at both trial and at sentence, and assessed the sincerity of her pleas for mercy. This Court did not find the Appellant's statements to be sincere or honest. Likewise, this Court noted that it received several letters from family and friends and while the Appellant may be able to convince friends and relatives of her innocence, this Court found her denial of culpability extremely incredible. During allocution, the Appellant shifted blame towards the victim, stating: "I should have never allowed her into our lives [ . . . ] I will never allow someone or something to jeopardize my relationship with my daughter, my husband, or my family." (N.T. January 14, 2020 p. 10); See Commonwealth v. Begley, 780 A.2d 605, 644 (Pa. 2001); Commonwealth v.

47

Constantine, 478 A.2d 39 (Pa. Super. 1984); Commonwealth v. Gallagher, 442 A.2d 820 (Pa. Super. 1982)(holding that a sentencing court may determine a defendant's potential for rehabilitation by considering demeanor, apparent remorse, manifestation of social conscience, and cooperation with law enforcement agents).

The Appellant did not appreciate the seriousness of her conduct, which is an obvious gauge of her potential for rehabilitation. This Court cannot reward the Appellant's tolerant attitude towards sex assault with leniency in sentence. This Court opined that the victim among many others will suffer long term effects in placing trust in adults. Thus, deterrence and incapacitation are necessitated to assist the Appellant in rehabilitation and recognition of the wrongfulness of her behavior as an educator, adult, and mentor. The Appellant's sentence will provide protection to the community and deter future sexual assaults amongst educators and minor students, especially in situations with trusting parents as well as encourage the utmost compliance for mandated reporters.

This Court also had the benefit of a pre-sentence investigation report (hereinafter "PSI") which was thoroughly reviewed. As such, this Court became aware of the Appellant's specific characteristics, zero prior record score and lack of involvement in the criminal justice system. Notwithstanding, the guidelines inherently give credit to those who have led a relatively law abiding life, a lack of prior record is one element utilized in determining the guideline sentence range. The guideline sentence as computed in this case is based on a prior record score of zero (0), thus to assign the lack of a prior record as a reason for deviating from the guidelines is to, in effect give the Appellant credit for the same factor twice, which would be improper. See Commonwealth v. Mahlon Drumgoole, 491 A.2d 1352 (Pa. Super. 1985). In fact, relying on an offender's clean criminal record to impose probation where the Sentencing Guidelines call for

48

a minimum prison term is reversible error and grounds for a Commonwealth appeal of that sentence. See also Commonwealth v. Celestin, 825 A.2d 670 (Pa. Super. 2003), *appeal denied*, 844 A.2d 551 (Pa. 2004); Commonwealth v. Septak, 518 A.2d 12984 (Pa. Super. 1986). The Appellant's guideline sentence is not disproportionate to the facts and particular circumstances of the Appellant's offenses; the victim involved, in light of her age and vulnerabilities, the length of time in which the Appellant manipulated the victim, choosing to secret her husband's actions and her own, risking her livelihood, demonstrating a lack of insight as an adult, albeit her previous law-abiding life and educational training. The Appellant produced severe emotional and psychological impact on the victim and other students within her class and community as well as trusting parents. The Appellant's actions completely contravene her educational training and educational positions. The Appellant's role and conduct on some occasions was at least reckless, if not knowing on most occasions. It appeared to this Court that the Appellant's role and conduct required a sentence of confinement, because to do to otherwise would seriously depreciate the seriousness of the crimes, if not mock and "fly in the face" of mandated reporter legislation. This Court's sentencing discourse indicates it properly relied upon the evidence adduced at trial, testimony during the sentencing hearing, and the PSI when it sentenced Appellant. This Court simply could not ignore the length of time in which the abuse occurred and the means through which the abuse was facilitated. This Court found the amount of phone contacts at all hours with the victim albeit only one-sixth of the approximate length of the abuse to be not only an additional means of control over the victim, but also entirely inappropriate and the content repugnant. The Appellant relied on the victim's musical interests, and hobbies, especially her troubled/inattentive family scenario to draw the victim towards her and her husband, and isolate the victim from her parents, friends, co-workers, and other

49

educators. The Appellant took advantage of the victim's vulnerabilities and deluded the victim into thinking the Appellant and the Appellant's husband were the only individuals who were concerned about her. The victim impact stated: "she knew what was going on and didn't do anything about it. She had spent a lot of time talking to me and learning about my life. She spent hours helping me with things music related [ . . . ] after all of the time [ . . . ] it crushes me that she would go along with Nick in letting him manipulate me to do what he wanted. It makes me feel sick and disgusted and it most likely always will. She had the power to report it or stop what was going on and she chose to let it go."

Thus, the above-delineated findings upon which the Appellant's incarceration was based were valid grounds for a guideline sentence. This Court's sentence was neither irrational nor unguided by sound judgment and does not warrant reversal.

Second, even setting aside the presumptive reasonableness of the standard range sentence the Appellant received, the Appellant does not raise a substantial question for appellate review. There is no dispute that this Court imposed a sentence within the standard range of the sentencing guidelines. An allegation that the sentencing court failed to consider certain mitigating factors generally does not necessarily raise a substantial question. See Commonwealth v. Moury, 992 A.2d 162, 171 (Pa. Super. 2010), citing Commonwealth v. McNabb, 819 a.2d 54, 57 (Pa. Super. 2003); Commonwealth v. Weller, 731 A.2d 152, 155 (Pa. Super. 1999)(reiterating allegation that sentencing court "failed to consider" or "did not adequately consider" certain factors generally does not raise substantial question); Commonwealth v. Dodge, 77 A.3d 1263, 1272 n. 8 (Pa. Super. 2013)( ("Careful litigants should note that arguments that the sentencing court failed to consider the factors proffered in 42 Pa.C.S. § 9721 does not present a substantial question).

If a presentence investigative report exists, Pennsylvania Appellate Courts shall presume that the sentencing court "was aware of relevant information concerning the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself." Commonwealth v. Devers, 546 A.2d 12, 18 (Pa. 1988). The Devers court further articulated that "it would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand." Id. See Commonwealth v. Boyer, 856 A.2d 149 (Pa. Super. 2004); Commonwealth v. Burns, 765 A.2d 1144 (Pa. Super. 2000). Prior to sentencing, this Court heard and considered the testimony of the victim, numerous character witnesses testifying on behalf of the Appellant, and the Appellant and reviewed all exhibits, specifically the Pen-Link evidence documenting over 23,000 phone contacts/texts combined between the Appellant and the Appellant's husband with Joella (representing only one sixth of the time in which the allegations occurred). Additionally, this court had a benefit of a PSI. That this Court refused to weigh the proposed mitigating factors as the Appellant wished, absent more, does not raise a substantial question.

Ultimately, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code. See Commonwealth V. Cruz-Centeno, 668 A.2d 536 (Pa. Super. 1995), appeal denied, 676 A.2d 1195 (1996)(stating combination of PSI and standard range sentence, absent more, cannot be considered excessive or unreasonable). There is no indication on the record that this Court's sentence was based upon inaccurate, insufficient or improper information. Where a "trial court took a reasoned approach and sentenced [a defendant] after taking into account multiple factors,"

51

as in the current appeal, a reviewing court will "discern no abuse of discretion." See

Commonwealth v. Conte, 198 A.3d 1169, 1178 (Pa. Super. 2018).

13. Whether the trial court erred regarding the sentencing of the Endangering the Welfare of Children count as a third degree felony, when the Criminal Information failed to allege a "course of conduct" required for the enhanced grading, regardless of the specific question posed to the jury on the verdict slip?

Appellant was convicted by a jury of one (1) count of Endangering the Welfare of Children, a third degree felony. The jury specifically found that there was a "course of conduct," with regard to the Endangering Welfare of Children charge. See Verdict Slip June 19, 2019.; Compare Commonwealth v. Morales, 251 A.3d 1222 (Pa. Super. 2021)(under the EWOC statute, in order to grade the offense as a third-degree felony, a specific determination must be made that "the actor engaged in a course of conduct" of endangering the welfare of a child).

In analyzing a grading issue, the Pennsylvania Superior Court has recognized that "course of conduct" is not an element of the offense of Endangering the Welfare of Children, but it is an additional fact, a jury question that impacts the grading of the offense. Commonwealth v. Popow, 844 A.2d 13, 18 (Pa. Super. 2004). Here, the Commonwealth alleged facts in the initial Criminal Information and Amended Criminal Information, which were proven at the time of trial to support the grading. Count II of the Criminal Information and Amended Criminal Information alleged between March 2015 and January 2018:

Endangering Welfare of Children-Parent/Guardian/Other Commits Offense
18 Pa. C.S. 4304(a)(1)- Grade: Felony 3; $15,000; 7 years;

being a parent, guardian, or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support, to wit: The defendant Ruth Baggetta, did allow Nicodemo Baggetta to engage in sexual activity and conversation with J.L. a female, age 16 [ a minor child].

52

Further, in support of the endangerment charge and the additional factor of "course of conduct," the Commonwealth provided the extensive and detailed testimony of [Victim] describing conduct that occurred over a two year period, coupled with 11,000 phone contacts via text or call with the Appellant, and 12,000 phone contacts via text or call with the Appellant's husband within a five month period. Additionally, the Appellant admitted to purchasing a camera lens as a gift, dinners, invitations to "hang out," approximately a dozen or more sleepovers, obtaining matching tattoos, visits to [Victim's] job, inviting [Victim] to her wedding, exchanging Christmas gifts with [Victim]. The jurors listened to the Appellant tell them that she did not notify administration, nor refer [Victim] to the guidance counselor despite being concerned about [Victim's] mental health or suicidal ideations throughout a two (2) year period. Importantly, the Appellant did not notify administration when she became aware of the sexual contact occurring with her husband and [Victim].

[Victim] testified that she performed oral sex on the Appellant's husband simultaneously with the Appellant. [Victim] stated: "I had stopped there to visit before I was going to hang out with friends [ . . . ] Ruth and Nick were supposed to go to dinner with Ruth's parents. And when I got there, she had told me that she told Nick that if he went to her parents' house for that dinner that we would both give him oral." (N.T. June 17, 2019 p. 50). [Victim] testified that she and the Appellant simultaneously performed oral sex on the Appellant's husband. **Id.** at 51, 83. [Victim] explained she saw the Appellant and the Appellant's husband weekly, and that she would regularly sleep at the Appellant's house overnight. The Appellant provided her access to "hang" in the house often. The Appellant even allowed [Victim] to shower at the house. **Id.** at 41, 51, 75. She stated: "I wouldn't be able to remember how many times. It was often. Like, if I was seeing them, usually I ended up sleeping there quite a bit [ . . . ] I usually would sleep in their bed with

53

them [ . . . ] there were a few times where I slept in the middle between the two of them." **Id.** at 58. [Victim] also explained that on some occasions, the Appellant's husband groped her on the outside of her clothes and underneath her clothes, all over her stomach, butt, and in between her legs, while she slept next to him and the Appellant. **Id.** at 58-59. [Victim] testified that the Appellant's husband purchased a vibrator for [Victim] and operated the vibrator on [Victim]. She noted that the vibrator was kept in the Appellant's upstairs bathroom drawer, easily within the purview and access of the Appellant. **Id.** at 60.

At the outset of the relationship, [Victim] recalled a conversation with the Appellant's husband, wherein he told [Victim] that the Appellant believed they should act on their urges and kiss. **Id.** at 43. [Victim] testified: "he had told me that they had kind of talked about it and that she said that at some point that we should kind of act on those feelings [ . . . ] that she had said that we should just kind of kiss and get over it." **Id.** at 44. Clearly, the Appellant's instructions were not for the purpose of safeguarding or protecting the welfare of [Victim]. In fact, [Victim] noted the Appellant's awareness of the initial sexual encounter. [Victim] explained that while the Appellant conducted at a music festival, [Victim] and the Appellant's husband engaged in sexual activity. She stated that upon the Appellant's return home, "Nick ended up telling her what had actually happened, because he said that he felt bad [ . . . ] that it wasn't supposed to go that far." **Id.** at 46. Since that initial sexual encounter, [Victim] testified to "more than ten" other sexual encounters with the Appellant's husband, involving oral sex, digital penetration, and anal sex **Id.** at 46-56.

Clearly, the allegations and evidence did not comprise a single event, but separate and distinct instances of sexual activity and conversation. Here, the Commonwealth presented evidence of multiple events, wherein the Appellant possessed awareness of the sexual activity occurring with her husband, disregarded her husband's actions and communications with [Victim],

54

and even participated in the sexual activity with her husband and [Victim]. The Appellant encouraged an intimate relationship among [Victim] and her husband. She befriended [Victim], manipulated her role as teacher and band instructor, exhaustively communicated with [Victim] and promoted bad behaviors. She permitted unrestricted access to her personal life and home, including multiple overnight stays and sleeping in the same bed. Over a two year period, the Appellant failed to take protective action and fostered opportunities for sexual activity to occur. Ultimately, the Appellant engaged in multiple acts of her purpose of having sexual activity and an intimate relationship with [Victim]. For these reasons, the evidence supported a "course of conduct" finding.

Importantly, this Court properly defined "course of conduct" in its instruction and the jury was charged to determine and making a finding on "course of conduct." (N.T. June 19, 2019 p. 119). Pennsylvania law defines "course of conduct" as "multiple acts over time" or "a pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct." Commonwealth v. Smith, 206 A.3d 565, 566 (Pa. Super. 2019); Commonwealth v. Gray, 251 A.3d 1220 (Pa. Super. 2021).

As such, the jury was able to determine facts to support the grading of the Endangering Welfare of Children as a third-degree felony and understood that it was making a finding on "course of conduct." The record reflects that the Commonwealth alleged in the criminal information/ amended criminal information, and presented evidence at trial, of the additional factor of "course of conduct," and this Court instructed the jury on "course of conduct." Accordingly, the evidence is sufficient to establish the crime of Endangering the Welfare of Children as a third-degree felony, and this Court properly graded this offense at sentencing. Therefore, this Court's sentence as a third-degree felony is legal and the Appellant's claim is

55

without merit. See <u>Commonwealth v. Smith</u>, 206 A.3d 551, 565 (Pa. Super. 2019)(finding appellant's grading argument meritless where the criminal information charged corruption of minors as a third degree felony, consistent with the Commonwealth's evidence presented at trial that the Appellant engaged in the aforementioned actions on multiple occasions, and where the trial court gave a proper jury instruction with the "course of conduct" requirement); <u>Commonwealth v. Suarez</u>, 2016 WL 5210886 (Pa. Super. 2016)(finding that it is clear from the record that where the Commonwealth alleged in the criminal information and presented evidence at trial of the additional factor, and the jury was instructed on the element of "course of conduct," in order to convict, the trial court properly graded the offense at sentencing).

14. **Whether the trial court erred in denying Defendant's Motion for Bail Pending Appeal when there was already a significant amount of time in jail served, and Defendant presents no threat to the community and/or victim, has both family and community support, presents no flight risk, as evidenced by the fact that while previously on bail and on home confinement she appeared for all required court appearances and committed no bail or home confinement violations, and desires to both begin the process of rebuilding her life and actively participate in the preparation of her appeal?[6]**

The Pennsylvania Superior Court has explained: "[w]e will review the lower court's order denying a bail application for an abuse of discretion and will only reverse where the trial court misapplies the law, or its judgment is manifestly unreasonable, or the evidence of record show that [its] decision is a result of partiality, prejudice, bias, or ill will." <u>Commonwealth v. Bishop</u>, 829 A.2d 1170, 1172 (Pa. Super. 2003).

Here, the Appellant claims that this Court should have granted her motion for bail because the Appellant served periods of incarceration and house arrest programing without incident and was neither a threat to the community or flight risk.

Pa. R. Crim. P. 521(b)(2) provides, in relevant part as follows:

---

[6] Technically, to invoke jurisdiction to review an order pertaining to bail, the Appellant should have filed a petition for review pursuant to Chapter 15 of the Pennsylvania Rules of Appellate Procedure. Pa. R.A.P. 1762(b)(2).

when the sentence imposed includes imprisonment of 2 years or more, the defendant shall not have the same right to bail as before verdict, but bail may be allowed in the discretion of the judge

Id.

Pa. R. Crim. P. 521(d)(2) provides, in relevant part as follows:

The decision whether to change the type of release on bail or what conditions of release to impose shall be based on the judge's evaluation of the information about the defendant as it relates to the release criteria set forth in Rule 523. The judge shall also consider whether there is an increased likelihood of the defendant's fleeing the jurisdiction or whether the defendant is a danger to any other person or to the community or to himself or herself.

Id.

Accordingly, this Court presided over the Appellant's trial and sentencing and, as such, is familiar with the nature of the offense, the character of the Appellant, her circumstances, and thus held pertinent information on which to conclude that bail should be denied pending appeal. Contrary to the Appellant's claims, this Court denied bail pending appeal because she presented a threat to the community. As noted by this Court when considering the Appellant's sentence, this Court found the Appellant's actions to be predatory in nature and therefore presented a risk to the community, especially Lakeland Highschool students and band members, primarily, the victim. In the victim impact statement, the victim revealed to this Court that she is in a "difficult place" and disgusted by the Appellant's power to stop what was occurring but then did nothing.

The Appellant demonstrated to this Court a cognitive distortion in that she is an adult and is incapable of managing and understanding sexually inappropriate behaviors towards minors. This Court found the Appellant's preoccupation with the victim troubling, especially where the Appellant held the control to notify law enforcement. The Appellant did not posit to this Court any treatment plan to assist with her cognitive abnormalities. While, the Appellant shows evidence of positive support systems within her family, the Appellant held those positive support

57

systems at the time of the instant offenses and chose to engage in and tolerate sexually inappropriate behavior for at least two (2) years, including investing an excessive amount of time, money, and energy in grooming the victim. It is in the context of trust that the Appellant exploited the student/teacher/mentor relationship. As such, this Court found the Appellant's support system to be an unavailing factor, weighed among the nature and circumstances of the offenses. Moreover, the Appellant held a teaching career, which was terminated due to the instant offenses, and has not demonstrated to this Court any other employment prospects unrelated to education or minors, while previously on bail. Since the Appellant is not gainfully employed, this factor is likewise unavailing. Finally, regardless of the Appellant's zero prior record, the Appellant was convicted of four serious felony offenses, and the issues raised as to the sufficiency of the evidence to support the convictions have little, if any, likelihood to prevail.

Additionally, the impact of incarceration on the Appellant is not exceptional from others sentenced for sexually inappropriate offenses towards minors, in light of the Appellant's privity to the victim. In making this bail determination, this Court balanced the appropriate factors, and did not abuse its discretion.

BY THE COURT:

_____, J.
Michael J. Barrasse

CC: Notice of the entry of the foregoing Memorandum has been provided to each party pursuant to Pennsylvania Rule of Criminal Procedure 114 by mailing time-stamped copies to the following individuals:

Lisa Swift, Esq.
Sara Varela, Esq.
Lackawanna County District Attorney's Office


Jason Shrive, Esq.
Attorney for Appellant